## ST. PAUL ELECTRICAL WORKERS WELFARE FUND AND OTHERS v. ROBERT A. CARTIER.

167 N. W. (2d) 131.

April 11, 1969—No. 41268.

*Kelley & O'Neill* and *James C. O'Neill,* for intervenor appellant.

*Felhaber, Larson, Fenlon & Vogt* and *Thomas M. Vogt,* for respondent petitioners.

*Robins, Davis & Lyons* and *Stanford Robins,* for Local Union No. 110, International Brotherhood of Electrical Workers, AFL-CIO.

PETERSON, JUSTICE.

Appellant, Robert A. Cartier, who has a beneficial interest in a welfare trust and a pension trust created pursuant to collective bargaining agreements between his employer and his union, intervened in objection to a district court petition by respondents, who are collectively the trustees of the welfare trust and the employer-union settlors of the welfare trust, to transfer a substantial part of the fund of the welfare trust to the pension trust. After extensive pretrial proceedings and hearing in which both matters of fact and appropriate principles of law were ably contested by experienced counsel, respondents' petition was granted and appellant's complaint in intervention was dismissed with prejudice. Appellant thereafter moved for amended findings of fact and conclusions of law or for a new trial and, in addition, moved for an allowance of his attorneys' fees, costs, and disbursements. The motions were denied, and the appeal is from those orders.

The St. Paul Electrical Workers Welfare Fund (hereafter "Welfare Fund"), an express trust authorized by statute,[1] was created by a written trust agreement on May 1, 1950, and is maintained pursuant to collective bargaining agreements between the Minnesota (St. Paul) Chapter of the National Electrical Contractors Association, Inc., formerly the St. Paul Electrical Contractors Association, (hereafter "NECA"), a nonprofit corporation representing individual employers in the electrical construction industry, and the International Brotherhood of Electrical Workers, Local Union No. 110, AFL-CIO (hereafter "Union"), a labor organization acting as the established collective bargaining representative

---

[1] Minn. St. 501.11.

of some 1,000 NECA employees in the St. Paul area, including appellant. The St. Paul Electrical Construction Pension Fund (hereafter "Pension Fund") is an express trust created by a separate trust agreement on January 15, 1964, pursuant to a collective bargaining agreement between the same parties. The trustees of the Welfare Fund, together with NECA and the Union, are the respondents in this matter.

It may be observed, as a brief preliminary to the issues presented, that welfare and pension trusts arising out of a collective bargaining relationship are rather different from most other trusts known to the common law. The trust funds come primarily from the contributions of the employer and are in practical fact wages paid to its employees. The trusts' beneficiaries are the employees, who very often are numerous and not individually identified in the trust agreement. Negotiation of welfare and pension programs and revision of existing programs are often among the major issues between employers and representatives of employees in their periodic negotiation of wages and other conditions of employment. All such trusts are governed by our state trust statutes, which protect the integrity of the trust and the interests of the beneficiaries; but trusts arising out of a collective bargaining relationship affecting interstate commerce are at the same time governed by such Federal statutes as the Labor-Management Relations Act, 1947.[2] Our state statute, even though

[2] 61 Stat. 136, 29 USCA, § 141, et seq.; see, also, Welfare and Pension Plans Disclosure Act, 72 Stat. 997, 29 USCA, § 301, et seq. Section 302 of the Labor-Management Relations Act, 61 Stat. 157, as amended, 29 USCA, § 186, which makes criminal the request, acceptance, or making of gifts to employee-representatives contains this relevant exception: "(c) The provisions of this section shall not be applicable * * * (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer * * * *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the

not tailored with specific reference to these trusts, unquestionably governs—perhaps exclusively so—the interpretation of the trust agreement and the immediate issue of trust administration;[3] but even though the principal purpose of the Federal statutes is to protect the trusts' beneficiaries in their more specific status as employees, we think the latter establish a relevant context in which the former should be construed.

The Welfare Fund and the Pension Fund have six trustees and, in conformance with the Labor-Management Relations Act, three of the trustees are selected by NECA and three by the Union. The trustees of each fund are the same persons and, as is not uncommon in labor-management relations, these trustees are the same persons who serve as the principal representatives of the parties in the basic collective bargaining relationship out of which the funds were established. Legal counsel for the Welfare Fund apparently are the same lawyers who represent NECA and the Union for collective bargaining. Appellant, in contesting the action of respondent trustees *and* settlors of the Welfare Fund, does not assert a violation of Federal statutes but asserts only rights under the state trust statute and common-law principles.

■ The primary issue is whether there is adequate evidentiary support for the trial court's findings that the transfer of a substantial part of the Welfare Fund's assets to the Pension Fund is not in contravention of the language and purposes of the Welfare Fund Trust Agreement and complies with statutory criteria for authorizing such transfer. Section 501.23 provides:

"When any trust is expressed in the instrument creating the trust estate every sale, conveyance, or other act of the trustee in contra-

---

employer, and employees and employers are equally represented in the administration of such fund, * * * and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons * * *; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; * * *."

[3] See Bowers v. Ulpiano Casal, Inc. (1 Cir.) 393 F. (2d) 421, and cases cited; cf. Copra v. Suro (1 Cir.) 236 F. (2d) 107.

vention of the trust shall be absolutely void, except as in sections 501.23 to 501.32 provided. The district court * * * may, by order, * * * authorize any such trustee, whether he be beneficially interested in such trust property or not, to * * * dispose of * * * all or any part of such trust property, whether real or personal, when it appears to the satisfaction of the court that it is necessary, or for the best interest, or for the benefit of the trust estate, or of the person or persons beneficially interested therein * * * and that it will do no substantial injury to the heirs or next of kin, or others in succession, expectancy, reversion, or remainder, in respect of such property."

The Welfare Fund Trust Agreement directed the trustees to receive and hold the trust funds "for the purpose of providing the benefits for which this Plan and Fund has been established" and to keep them "in trust for the use and purpose herein provided, and for no other uses and purposes." The agreement, however, conferred upon the trustees broad "powers for the purposes of effectuating the trust" and authorized them "[t]o allocate and reallocate the assets and income of the fund and contributions thereto for the purpose of providing the benefits for which the trust fund and the plan hereby established has been created." The trustees, moreover, were granted the "sole and exclusive judgment and discretion" to determine the "kind, number and types" of the welfare benefits to be accorded to the beneficiaries, based upon the assets available to provide them, and "to amend or modify the same at any time without any liability to perpetuate any particular benefit or benefits."

Until the establishment and funding of the Pension Fund, the Welfare Fund has provided two general classes of benefits: (a) Hospitalization and medical benefits, including temporary nonoccupational disability and maternity benefits; and (b) total and permanent disability benefits, referred to as "the special disability benefit," and retirement benefits, referred to as "old age assistance benefits," the latter benefits having commenced on April 1, 1958. The first class of benefits, which covers all employees, has been provided through insurance programs, the premiums of which are paid by the trustees. These insured benefits, the court found, are among the most liberal of that kind in the local labor area.

The permanent disability and retirement benefits, for which most of the employees were not immediately eligible, were not insured and were administered directly by the trustees. After allocating a part of its assets to a reserve for the payment of 2 years' insurance premiums, consistent with the advice of pension and acturial consultants, the trustees allocated the remainder to a "special disability fund" from which to pay these self-insured permanent disability and retirement benefits. The assets in the Welfare Fund available for these purposes grew from $176,300 at the end of the 1957 fiscal year to $906,700 at the end of fiscal 1963. At that time the trustees, with the advice of these consultants and tax counsel, determined that a separate and more formalized Pension Fund should be created as a safer and more sound vehicle for providing retirement benefits.[4] These considerations prompted the trustees to discontinue the old age assistance program of the Welfare Fund and to transfer $600,000 to the Pension Fund for the same purposes.

A twofold claim seems to dominate appellant's objection to the transfer: (1) Even though payment of retirement benefits under the informal old age assistance program within the Welfare Fund is authorized under that trust agreement, a transfer of that program, and the funds necessary to sustain it, to the Pension Fund is not authorized under the trust agreement or the trust statute; and (2) instead of using surplus assets to administer such program on an actuarially sound basis, the trustees should use them to improve the insured nonretirement benefits for the more immediate benefit of a greater number of employees within the group of beneficiaries.[5] Assuming the more technical validity of the first claim and ignoring the trustees' broad discretion as to the second, two im-

---

[4] The retirement program under the Welfare Fund was not actuarially sound. The surpluses in the Welfare Fund were attributable in part to the fact that claims for total and permanent disability had become stabilized. Tax counsel were concerned that the extent of these surpluses and its investment income was such that the tax-exempt status of the fund might be jeopardized.

[5] It appears that the trustees did make an increase in the insured welfare benefits in May 1967, 5 months after appellant had interposed his objections, an action perhaps in part attributable to the fact that the surplus assets had by then increased to approximately $1,200,000.

mensely practical circumstances indicate that these claims are without compelling substance. First, as appellant concedes, the trustees and the settlors could have unassailably achieved practically the same result simply by agreeing in collective bargaining to terminate the employer's obligation to contribute to the Welfare Fund (using the reserves to pay future insurance premiums and existing old age assistance benefits) and contemporaneously to initiate contributions to the Pension Fund (abandoning retirement benefits under the Welfare Fund and paying them from the Pension Fund). Second, the petition to transfer these funds was not alone the act of the trustees, whose acts are the particular subject of the statute, but was at the same time the act of the settlors themselves. The Union, moreover, acted in its representative capacity on behalf of the employees who were the beneficiaries of the Welfare Fund. Indeed, as the court found, the employees present at a duly called meeting in October 1966 had unanimously approved a resolution expressly authorizing the Union to do so and at another meeting in January 1967 had resolved to continue judicial proceedings for the approval of such transfer. We think that the terms of the trust agreement and the restrictions of the state trust statute should not be read in isolation from the practical circumstances of the collective bargaining relationship out of which the Welfare Fund had its inception.

The trial court found, as we think a realistic appraisal of the evidence warrants, that the proposed transfer was not inconsistent with the language or purposes of the Welfare Fund; that the transfer of its funds to the Pension Fund would provide retirement benefits to the beneficiaries eligible for retirement under the Welfare Fund and would effectuate the purposes of the Welfare Fund; that the transfer was for the best interests and the benefit of the Welfare Fund and its beneficiaries and would do no substantial injury to any person beneficially interested in that fund; and that the trustees had not abused their discretion. These findings support the conclusion that the transfer was accordingly authorized by the statute and that an approval of the transfer should be ordered.[6]

---

[6] An article of the Welfare Fund Trust Agreement authorized the trustees, upon termination of the trust agreement, to petition a court for instruc-

■ Appellant contends that he should have been allowed reasonable attorneys' fees, costs, and disbursements incurred in the litigation of his objections, notwithstanding their rejection, on the grounds that his intervention was a good-faith effort by a beneficiary to prevent an unauthorized diversion of trust assets and that his efforts did have at least the beneficial result of clarifying a basic ambiguity in the Welfare Fund Trust Agreement.[7] This claim is premised upon the doctrine of In re Living Trust Created by Atwood, 227 Minn. 495, 500, 35 N. W. (2d) 736, 740, 9 A. L. R. (2d) 1126, 1131, in which this general rule is stated:

"* * * [C]osts and attorneys' fees may be allowed out of the trust estate to any necessary party who is acting primarily for the benefit of the estate in securing a clarification of ambiguous trust-instrument language where a reasonable doubt as to its meaning exists. * * * In such cases, the litigation is indispensable to the proper administration of the trust and is a proper charge thereon. * * * In the sound and cautiously exercised discretion of the court, and not as a matter of right, attorneys' fees and other expenses reasonably and necessarily incurred by all necessary parties to litigation may be allowed and properly charged to the trust estate where such litigation, with respect to substantial and

---

tions as to the manner and means of winding up the trust and distributing the assets thereof. The respondents additionally argued, and the court apparently accepted the argument, that the power of the trustees to terminate the entire trust fund, upon approval of the parties, equally conferred the power to make a partial termination—that if a distribution in the event of a termination is allowable, a distribution in the event of a partial termination is equally allowable. Whelan v. O'Rourke, 5 App. Div. (2d) 156, 170 N. Y. S. (2d) 284, and Nicolette v. Essenfeld, 11 Misc. (2d) 197, 171 N. Y. S. (2d) 373, seem to give some support to respondents' position, although the factual settings are not completely analogous.

[7] He urged, too, that his efforts had "arguably" contributed to a subsequent improvement in the insured nonretirement benefits under the Welfare Fund. Even were this undeniably the fact, however, it is doubtful that a beneficiary should be indemnified for pressuring trustees to perform an act which is plainly and exclusively within their own judgment and discretion. The trustees state that the decision had been made prior to appellant's intervention and that only the effective date had been deferred.

material issues, is necessary in order to resolve the meaning and legal effect of ambiguous language used by the settlor in the trust instrument, if an adjudication thereof is essential to a proper administration of the trust * * *."

The trial court expressly considered the rule of the Atwood case but denied appellant's motion on the ground that "[h]e was not a necessary party, he was purely a volunteer."

We do not think appellant's contention should be determined alone upon the proposition that he was not a necessary party in these proceedings. He was a necessary party at least in a technical sense, for §§ 501.25 and 501.26 required that all persons having any right or interest in the trust property are to be served with notice and have a right to be heard. There is, to be sure, authority for the proposition that beneficiaries are not necessary parties in cases where, as in this case, the trustee represents the beneficiaries or the beneficiaries are either unspecified or so numerous as to make it impracticable to make them all parties.[8] Al-

---

[8] In Lower Colorado River Authority v. Chemical Bank & Trust Co. (Tex. Civ. App.) 185 S. W. (2d) 461, affirmed on another issue in 144 Tex. 326, 190 S. W. (2d) 48, the bonds secured by a trust indenture were negotiable bearer bonds held by numerous owners throughout the United States, and the trustees had no way of knowing who they were except as and when the maturing bonds and interest coupons were presented for payment. The court there held that the impracticality of joining these numerous beneficiaries as necessary parties to an action by the trustees excused their nonjoiner, stating (185 S. W. [2d] 465): "It is a well-settled rule that in general the beneficiaries of a trust are proper, and usually necessary, parties to suits relating to the trust estate. This is particularly true as to specifically named beneficiaries. * * * Or where the purpose of the suit is to modify, alter or end the trust. * * * However there are certain well-defined exceptions to this rule under which the instant case comes. In instances wherein, by the terms of the trust, or from the nature of the suit, the trustee represents the beneficiaries; 'or where the beneficiaries are so numerous as to make it difficult or impracticable to make them all parties, or where the relief sought in no wise affects the relations of the trustee with them,' beneficiaries are not necessary parties. 65 C. J., § 759, P. 870 * * *. * * * This suit was not to modify, alter nor terminate the trust; but purely to con-

though such exception might be applicable in other situations, it is not appropriate in this case. The Union had sent a letter to appellant, as it did to all other beneficiaries, advising him of the pending judicial proceeding and his right to be heard. After his intervention has been allowed, it is inappropriate to hold that he was not in these circumstances a necessary party. We do not think, moreover, that one with an undisputed beneficial interest in the trust can be fairly termed an interloper or volunteer, even though he represented only himself and no other beneficiaries.[9]

We hold, therefore, that the matter should be remanded to the trial court for its further determination as to whether appellant may be otherwise entitled to an allowance under the principles of the Atwood case. In so doing, we neither overlook significant differences in fact between the situation in this case and in Atwood nor the basic discretion of the trial court. Even so, this case is at least of sufficient significance, as one of first impression and importance in labor-management negotiated trusts, to warrant a determination of this claim on grounds less technical than that appellant was purely a volunteer and not a necessary party.[10]

strue it in the interest, not only of the parties to the indenture, but of the beneficiaries thereunder as well. While the indenture did not in express terms authorize the trustees to exclusively represent the bondholders in this particular character of suit, such was, we think, its clear intent."

[9] Appellant claimed to represent a class of some 25 Union members similarly situated, but the court found that he did not. In addition to the resolution of the Union membership in October 1966, authorizing the Union to petition the district court for approval, there was a second meeting in January 1967, attended by appellant and other members, all of whom had been given notice by letter that the subject would again be considered. The minutes of the January meeting recite that a motion to continue efforts to get court approval of the transfer was unanimously adopted. Appellant testified that 3 to 4 percent of the votes at the general meeting were cast in opposition to the motion, but in a deposition only a month after the general meeting he testified that he had no recollection of any such motion. His right to bring a class action was, in these circumstances, not clearly established. See, Slezak v. Ousdigian, 260 Minn. 303, 110 N. W. (2d) 1.

[10] The court perhaps considered that the issues raised by appellant were not of substantial merit in light of his individual stake in the Welfare Fund. Sim-

We do not allow costs or disbursements to either party in this court. The trial court may take this disallowance into consideration if, in the exercise of its discretion, it determines to allow any part of appellant's claim for attorneys' fees, costs, and disbursements.

Affirmed in part; reversed and remanded in part.

ple division of the $600,000 involved in the proposed transfer by the total number of beneficiaries does indicate that appellant's personal stake was far less than the almost $17,000 of attorneys' fees and expenses incurred on his behalf in this litigation. This is an important consideration, as we indicated in In re Trust Under Will of Comstock, 219 Minn. 325, 17 N. W. (2d) 656; but it is not necessarily decisive, as we indicated with respect to the somewhat analogous situation of a stockholder's derivative suit in Bosch. v. Meeker Co-op. Light & Power Assn. 257 Minn. 362, 101 N. W. (2d) 423. While we have in this opinion affirmed that a democratically represented majority should not unduly be frustrated by overly technical considerations, we are not unmindful that the dissenting views of a minority should not be too summarily dismissed and muted in what in some situations might be a labor-management monolith.