NATIONAL ASSOCIATION OF REGION-
AL MEDICAL PROGRAMS, INC.,
et al., Plaintiffs,

v.

Honorable Caspar W. WEINBERGER
et al., Defendants.

Civ. A. No. 1807–73.

United States District Court,
District of Columbia.

May 19, 1975.

Jerome S. Wagshal, Washington, D. C., for plaintiffs.

Bruce E. Titus, U. S. Dept. of Justice, Civ. Div., Washington, D. C., for defendants.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This case is now before the court on application by plaintiffs' counsel, Jerome S. Wagshal, for the award of an appropriate attorney fee from the benefiting plaintiff class. The case originally involved defendants' impoundment of funds appropriated for the Regional Medical Programs' [RMP] authority under Title IX of the Public Health Service Act, as amended, 42 U.S.C. § 299 et seq., and other restrictions placed by defendants on the operations of RMPs. The court, in a ruling entered February 7, 1974, as amended by Order entered July 22, 1974, declared the impoundment and other restrictions unlawful and ordered defendants to obligate essentially all of the impounded funds. The amounts released pursuant to the court's order exceeded one hundred million dollars.

This case proceeded to final judgment as a class action certified pursuant to rules 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure. Formal notice of the pendency of the class action was not given but it is undisputed from the record that all members of the class knew of the action. On several occasions Mr. Wagshal communicated with all members of the class regarding the case. When a final negotiated settlement of the action was reached in 1974, the court ordered that all members of the class be given actual notice of the court's rulings and of the proposed settlement. Class members were given the opportunity to comment upon the proposed settlement and to object to any of its provisions. No objections were noted and the final amended judgment was entered July 22, 1974. Thereafter, on October 7, 1974, plaintiffs' attorney filed the present application asking the court to award an appropriate attorney fee from the benefiting plaintiff class.

Actual notice of this fee application was given to all members of the plaintiff class and all were invited to submit comments and/or to participate in the March 13, 1975 hearing on the petition.

Petitioner seeks a court order directing a fee to be paid him from the benefiting class. He asks particularly that the benefiting class be able to use grant funds in payment of the fee. Further, to the extent possible, petitioner suggests that his fee be paid out of those grant funds which remain unexpended. A large amount of these unexpended grant funds presently are held by defendants. Defendants oppose any fee which would be paid using grant funds, arguing that such a fee is barred by 28 U.S.C. § 2412 (1970) and that such a fee would violate the Public Health Service Act itself. Petitioner of course disagrees but argues that if defendants prevail on their argument, then the court can and should order plaintiff class to pay petitioner a reasonable fee using non-grant funds. Defendants do not oppose payment of a fee using non-grant funds so long as RMP operating efficiency is not significantly impaired. *See, e. g.*, Post-Hearing Supplement to Defendants' Opposition to Application by Plaintiffs' Counsel for the Award of an Appropriate Fee from the Benefiting Plaintiff Class at 1, filed April 7, 1975.

The court first will address the issue of the power of the court to award a fee from grant funds and also, in the alternative, will consider whether the court can order a fee *in personam* against plaintiff class members from non-grant funds. Since the court concludes in the affirmative on both of these issues, the court then will explain why this is a proper case for the court to exercise its equity powers and award a fee, and the amount of such a fee. Finally, the court will consider the mechanics of payment.

## I. *Power of the Court to Award a Fee from Grant Funds.*

During the course of this litigation the court has had control over a huge fund of money which was the subject of the case on the merits. By its decision on the merits the court ordered defendants to obligate all of the impounded monies to RMPs except for $5,000,000 which could be obligated for different purposes. The court has never completely lost jurisdiction over this fund and indeed by Order of January 29, 1975, ordered up to $200,000 of unexpended grant and unexpended direct operation funds to be deposited to the registry of the court. Pursuant to that order $180,000 of unexpended direct operation funds have been obligated in the name and to the credit of the court. *See* Report to the Court, filed Feb. 28, 1975.

There is clear precedent that the court may order an attorney fee paid from funds which the court has ordered obligated to grantees. In National Council of Community Mental Health Centers, Inc. v. Weinberger, 387 F.Supp. 991 (D.D.C.1974), appeal pending, [hereinafter sometimes referred to as NCCMHC case] the court ordered a fee paid from grant funds, thereby rejecting the government's argument that such payment constitutes an attorney fee against the United States in violation of 28 U.S.C. § 2412. The court finds that precedent pursuasive and notes with particular approval certain of the cases cited by that court. *See* Lafferty v. Humphrey, 101 U.S.App.D.C. 222, 248 F.2d 82, cert. denied, 355 U.S. 869, 78 S.Ct. 118, 2 L.Ed.2d 75 (1957); Emmet v. Whittier, 164 F.Supp. 563 (D.D.C.1958), rev'd, 108 U.S.App.D.C. 191, 281 F.2d 24 (1960), cert. denied, 364 U.S. 935, 81 S.Ct. 380, 5 L.Ed.2d 367 (1961). The court also believes that the cases of Freeman v. Ryan, 133 U.S.App.D.C. 1, 408 F.2d 1204 (1968); Honda v. Mitchell, 136 U.S.App.D.C. 22, 419 F.2d 324 (1969), and Larionoff v. United States, 365 F.Supp. 140 (D.D.C.1973) support petitioner's position that funds held by the federal government may be used to pay an attorney fee. The court finds unpersuasive defendants' attempt to dis-

tinguish this line of cases by arguing that the monies in this case originally were appropriated by Congress and that the federal government has a substantial and continuing interest in these monies. First, there is no evidence that the above-cited cases rest on any such narrow distinction as whether the monies originally were appropriated by Congress. In *Lafferty* the monies finally were to be paid pursuant to a statute and certainly the government had a continuing interest in making certain that the statute's purposes were carried out. Nevertheless, the court allowed payment of substantial attorney's fees out of the funds held by the government. And in *Emmet* it is apparent that certain of the monies designated to pay the attorney's fee originally constituted appropriated monies. *See* Whittier v. Emmet, 108 U. S.App.D.C. 191, 281 F.2d 24, 27 n. 5 (1960).[1]

The gist of petitioner's position is that when this court ordered defendants to obligate the RMP funds, these funds ceased to be funds of the United States such that an order to pay attorney fees out of the funds would be assessing fees against the United States. The Comptroller General in a series of rulings has held that funds which are awarded to a grantee lose their character as funds of the United States.

> It consistently has been held with reference to Federal grant funds that, when such funds are granted to and accepted by the grantee, the expenditure of such funds by the grantee for the purposes and objects for which made are not subject to the various restrictions and limitations imposed by Federal statute or our decisions with respect to the expenditure, by Federal departments and establishments, of appropriated moneys in the absence of a condition of the grant specifically providing to the contrary.

43 Comp.Gen. 697, 699 (1964). *See also* 36 Comp.Gen. 221 (1956). And in another situation, where grants were issued by the federal government to the states, the question was raised regarding whether the states, on using the money to purchase items, could pay the state sales tax. It was argued that payment of state sales tax would be illegal because it would be a state tax on the United States. The Comptroller General stated as follows:

> The States, therefore, in disbursing grant funds for purposes within the scope of the grant, may not be considered as "agents" of the United States; and, except for conditions specified by Congress in the grants, they are subject only to the restrictions imposed by State laws and regulations on the disbursement of other State funds.

37 Comp.Gen. 85, 87 (1957). When this court ruled that defendants' impoundment was illegal and that all impounded funds had to be obligated to grantees, the funds in question ceased to be funds of the United States such that an attorney fee might be construed as a fee against the United States. At that time they constituted grant funds and unless the Public Health Service Act bars use of the funds to pay an attorney fee, the court can order use of those funds to pay the fee in question. *See also* Celebrezze v. Sparks, 342 F.2d 286, 288 (5th Cir. 1965).

The court has examined the Public Health Service Act to determine whether Congress clearly restricted the use of grant funds for payment of legal services. *See* Mitchell v. Robert De Mario, 361 U.S. 288, 291, 80 S.Ct. 332, 4 L.Ed. 2d 323 (1960). As defendants admit, there is no clear legislative command which would restrict a court of equity from exercising its powers. Under the Act the grants are "to encourage and as-

1. While the Court of Appeals in *Emmet* reversed the District Court's award of attorney fees, it did so on the basis that it was not the proper case for such an award. Nothing in the case indicates that the District Court had no power to award a fee from those funds if the circumstances in the case had been different.

sist in the establishment of regional cooperative arrangements . . . ." 42 U.S.C. § 299(a). And later the Act declares that the Secretary of Health, Education, and Welfare is to make grants "to assist in establishment and operation of regional medical programs . . . ." *Id.* § 299d(a). The court agrees with petitioner that in face of defendants' illegal action in this case, use of grant funds to pay for an attorney is consistent with the Congressional directive to assist in establishment and operation of the RMPs. Defendants, however, cite their regulations which purport to limit the purposes for which grantees can use grant money. *See* 42 C.F.R. § 54.401 et seq. The court perceives two answers to this defense. First, the regulations themselves are ambiguous and thus do not, even if they could, clearly and validly restrict the court's equity jurisdiction. More important, if the regulations are construed to bar use of grant funds for these legal expenses, the regulations are invalid. Congress, when faced with defendants' illegal impoundment, took action to assure that no appropriations lapsed during the impoundment. Congress provided:

> Any funds necessary to be appropriated for full obligation of a fiscal year 1973 appropriation determined to have been unlawfully impounded by the executive branch of the United States Government in a civil action filed on or before June 30, 1974, are hereby appropriated out of any money in the Treasury not otherwise appropriated.

Pub.L. No. 93–245, § 501, 87 Stat. 1071 (1973). Clearly, Congress anticipated the use of civil litigation to end some of the illegal impoundments. Congress must have expected some if not all of these civil cases to be brought by the grant recipients who had been denied the monies appropriated by Congress. It would be absurd to think that Congress anticipated civil litigation by grantees similar to plaintiffs in this class action but would forbid these grantees to pay for the cost of an attor-

ney to bring such an action. *See* Hall v. Cole, 412 U.S. 1, 13–14, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). The court will presume no such absurd result. Accordingly, the court finds no bar to class members' use of grant funds in payment of the attorney fees in question.

II. *The Court has Power to Enter an In Personam Order Against Members of Plaintiff Class Ordering Payment of Attorney Fees.*

■ In the proceeding on the merits the court certified the case as a class action pursuant to rules 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure. Members of plaintiff class have received two formal court-ordered notices: one of the settlement constituting an amendment to the final judgment and one of petitioner's application for attorney fees. The class also has received considerable direct communication from Mr. Wagshal. In the case on the merits the court had *in personam* jurisdiction over each member of the plaintiff class—that determination is implicit in this court's certification of the class. The question arises, however, whether the *in personam* jurisdiction continues when this proceeding for attorney fees is commenced. The court concludes that *in personam* jurisdiction is present. That *in personam* jurisdiction does not derive from the fact that Mr. Wagshal presently adequately represents the class members; he does not since he now seeks a fee directly from them. *See NCCMHC* case, *supra*. However, having *in personam* jurisdiction over all plaintiffs in the case on the merits and having given each RMP actual detailed notice of the pendency of the fee proceeding and having given each RMP notice of its right to participate in this proceeding, the court holds that due process has been satisfied and that the court has valid *in personam* jurisdiction over each class member and can order each to pay a fee directly to Mr. Wagshal. *See* Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed.

865 (1950). This *in personam* jurisdiction rests on the fact that each RMP has been before the court on the merits, has benefited from the court's order requiring obligation of the impounded funds, and has been given notice and an opportunity to participate in the instant proceeding.

### III. *This is a Proper Case for the Court to Award Attorney Fees.*

This action falls within one of the well-settled exceptions to the American rule of denying attorney's fees as part of the costs of litigation. Carefully enunciated by the Supreme Court in Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), Mills v. Electric Auto-Lite, Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), and many other cases, this exception seeks to spread the cost of the plaintiff's efforts proportionately among those who benefited. This exception is not narrowly founded on any rigid set of facts which must be found but rather "is part of the historic equity jurisdiction of the federal courts. . . . [and] is part of the original authority of the chancellor to do equity in a particular situation." Sprague v. Ticonic National Bank, *supra*, 307 U.S. at 164, 166, 59 S.Ct. at 779. The recent Supreme Court decision in Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), while sharply limiting the private attorney general exception to the American rule, did not limit the exception applicable in this case. In this action the National Association of Regional Medical Programs was organized specifically to prosecute the case on the merits. To assure standing, two RMPs were named as plaintiffs also. However, there was an extreme lack of money to prosecute the case. Mr. Wagshal took the case, agreeing to receive a $35 per hour "front fee" from the National Association, with the express understanding that, if successful, he would then petition the court for a fee to be paid from the benefiting class. The $35 per hour fee that has been paid to Mr. Wagshal was not paid by the benefiting class; rather, that fee was collected as donations from the professional staff of the various regional medical programs. Clearly, this is a case where a plaintiff class—the 53 RMPs—have benefited from litigation brought on their behalf but for which they have not paid. Because of the recovery which they have received, an appropriate fee can be paid, providing reasonable compensation to Mr. Wagshal and also reimbursing the National Association of Regional Medical Programs for the payments it has made. *See also* Lindy Bros. Builders, Inc. v. American R. & S. San. Corp., 487 F.2d 161, 165–66 (3d Cir. 1973). In the following section analyzing the factors relevant to award of an attorney fee, the benefits and services rendered will become more apparent, further justifying the court's exercise of its equitable powers in this exceptional case.

### IV. *The Proper Fee in this Case.*

The court first must resolve a problem which apparently has perplexed many district judges in ruling upon attorney fee applications: what is the proper standard to apply. In this case petitioner argues vigorously that the settled rule in this jurisdiction is that the court apply a *quantum meruit* approach for fees paid in complex class actions. However, the law certainly is something less than clear in this regard, as evidenced by petitioner having devoted approximately 80 pages of legal memoranda to this subject. The cases in this jurisdiction are inconsistent. In some older cases the Court of Appeals implicitly has endorsed an approach which, while considering to some extent the time and effort involved, focuses most closely on the benefits conferred and grants counsel a percentage of those benefits. *See, e. g.,* Honda v. Mitchell, 136 U.S.App.D.C. 22, 419 F.2d 324 (1969); Freeman v. Ryan, 133 U.S.App.D.C. 1, 408 F.2d 1204 (1968); Bakery & Confectionery Workers International Union v. Ratner, 118

U.S.App.D.C. 269, 335 F.2d 691 (1964). Other recent cases have merely listed without extensive analysis the factors a district judge is to consider, including both the time and labor involved and the benefits conferred. *See, e. g.,* Evans v. Sheraton Park Hotel, 164 U.S.App.D. C. 86, 503 F.2d 177, 186–188 (1974); Wilderness Society v. Morton, 161 U.S. App.D.C. 446, 495 F.2d 1026, 1036–37 (1974) (en banc), rev'd, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Finally, recently both the district court and the Court of Appeals have endorsed an approach in a number of cases where time obviously was the principal factor in the court's analysis. *See* Kiser v. Huge, 517 F.2d 1275 (D.C.Cir. 1974) (en banc); Kiser v. Miller, 364 F.Supp. 1311 (D.D.C.1973), modified on other grounds, Kiser v. Huge, *supra*; National Council of Community Mental Health Centers, Inc. v. Weinberger, 387 F.Supp. 991 (D.D.C.1974), appeal pending; Larionoff v. United States, 365 F.Supp. 140 (D.D.C.1973). Further, two Circuits recently have adopted an approach to class action fees which emphasizes the time and hourly rate of the attorney as the focus of the court's attention. *See* City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974); Lindy Bros. Builders, Inc. v. American R. & S. San. Corp., 487 F.2d 161 (3d Cir. 1973). The *Lindy* case, together with the District Court's opinion on remand, 382 F.Supp. 999 (E.D.Pa. 1974), provides the most thorough explanation of the proper procedure for calculation of attorney fees which this court has discovered. One of the most important reasons for the detail set forth in the *Lindy* opinions was the appellate court's desire to have a clear and well-explained record upon which to evaluate the district court's discretionary exercise of equitable powers. A similar concern for the need for careful and clear district court explanation of its attorney fee calculations recently has been expressed by this Circuit. *See* Evans v. Sheraton Park Hotel, *supra*.

This court is in full agreement with those recent decisions which emphasize that the district court, in exercise of its equitable power to award attorney fees in complex class litigation, must set forth carefully the factors considered in determining the amount of the fee. Further, this court also agrees that in determining the fee the court must seek to afford reasonable compensation to the attorney, mindful that there has been great criticism of attorneys for excessive fees in contingent fee situations. Kiser v. Miller, *supra* at 1315. *See also* "Control of Attorneys' Fees and Expenses in Class Actions," Manual for Complex Litigation, 1 Moore's Federal Practice § 1.47 (2d ed. 1974). In litigation of this sort the counsel should not necessarily receive compensation similar to that received in antitrust or securities litigation. Rather, in public interest cases such as the instant one, the merits of each case must be judged individually. *See* Kiser v. Miller, *supra* at 1318. The court concludes that an approach focused primarily on *quantum meruit* principles is unjustified in this case. Rather, an approach combining factors from the *Kiser* and *Lindy* opinions and focusing primarily on the time and labor involved offers the proper procedure for determining the attorney fee in question.

The court's approach will be along the following lines. The court will analyze first the type of work involved in the case and the number of hours expended by Mr. Wagshal on various efforts. The court then will consider the proper hourly fee to be charged for this work. After arriving at a strictly hourly figure, the court then will consider what amount, if any, should be added to petitioner's compensation, based particularly on the contingent nature of this litigation, the benefits conferred on plaintiff class, the service rendered to the public, the difficulty of the issues involved and petitioner's skill in dealing with them, and the other factors set forth by the Court of Appeals in Evans v. Sheraton

Park Hotel, *supra*. This approach will assure reasonable but not excessive compensation for Mr. Wagshal and should encourage similar service in the future.

It is undisputed that Mr. Wagshal spent at least 602 hours on the merits of this case.[2] Mr. Wagshal has presented logs of this time which he used to bill the National Association at the rate of $35 per hour. Mr. Wagshal claims that the amount of time should be increased by one-third to 800 hours because of extra time he spent on the case and for which he did not bill. Mr. Wagshal has explained this extra time as follows. His paying client, the National Association, had only limited resources to finance this litigation and Mr. Wagshal knew that if the billings became too great, they would exhaust these limited resources. Thus, Mr. Wagshal did not bill his clients for much of the time he spent on the case and thus this time does not appear in his time logs. He emphasizes that since he expected, if victorious, to apply to the court for an attorney fee on a contingent fee basis, that it was unnecessary to keep a careful log of all this time. The 600 hours which Mr. Wagshal billed constituted a sufficient front fee for the litigation; he expected to get the rest of any fee on the basis of a court award if victorious. In the future the court would expect any attorney to keep careful records of all hours expended. However, at the time of this litigation, it generally was not expected that attorneys seeking a contingent fee in class litigation keep meticulous track of their hours. The court finds that Mr. Wagshal did keep thorough records of at least 600 hours. Under these circumstances, the court finds it appropriate to increase the number of hours Mr. Wagshal spent on the merits of this action from 600 to 700.

Mr. Wagshal has been a member of the Bar since 1953. He had extensive experience with the Antitrust Division of the Justice Department and from mid-1970 to mid-1973 was a partner in the law firm of Dickstein, Shapiro, and Galligan. Since that time he has practiced either alone or with one other attorney. It is difficult to compute precisely what Mr. Wagshal's normal hourly rate is because almost all of his work in private practice has been on a contingent fee basis. On occasion he has undertaken work at $75 per hour. Presently, he is counsel in certain antitrust matters at a fee of $75 per hour plus a substantial additional amount if he should win. Mr. Wagshal estimates that his normal fee on an hourly basis would be between $100–$125 per hour. It must be noted, however, that Mr. Wagshal, practicing alone, was required to address a wide range of issues, varying from extremely complex to simple. Under all of the circumstances the court concludes that a reasonable hourly rate for all of the work Mr. Wagshal performed on the merits of this case is $70 per hour. Thus, for 700 hours spent on the merits of this case, the time factor in the compensation will be $49,000.

Petitioner claims to have spent 475 hours in preparation of this fee application. First, petitioner is entitled to compensation for the reasonable time and effort in petitioning the court for a fee. *See* National Council of Community Mental Health Centers, Inc. v. Weinberger, *supra* at 996; Lindy Bros. Builders, Inc. v. American R. & S. Corp., 382 F.Supp. 999 (E.D.Pa.1974). The court finds that 475 hours for preparation and prosecution of the attorney fee application is excessive. The court does not doubt that Mr. Wagshal expended that much effort and does not doubt that on certain issues, particularly those dealing with the power of the court to award fees from grant funds, considerable effort was required. However, on many issues, particularly those relating to the proper legal standards in computation of attorney fees, the court finds that petitioner's papers have been exces-

---

2. Consideration of compensation for the time spent in preparation of the present fee ap- plication will be dealt with later in this Memorandum Opinion.

sive and repetitive. Further, certain issues were neither novel nor complex and much research on some issues was done previously in the NCCMHC case. Under these circumstances, the court concludes that the proper hourly rate for work on petitioner's fee petition is $50 per hour. Further, the court has reduced the number of hours for which compensation will be paid from 475 to 150. These reductions reflect the amount of effort and skill necessarily expended in seeking this fee. *See* Larinoff v. United States, *supra*; Kiser v. Miller, *supra*. Thus, the time compensation factor regarding the attorney fee application is $7500.

■ The court next must determine what incentive fee or bonus, if any, is appropriate in this case. In resolving this question the court considers the following factors: the benefits conferred upon the class, the benefits conferred upon the public, the contingent nature of the fee arrangement, the difficulty of the issues and the skill demonstrated, the preclusion of other employment, the incentive fee or bonus in similar cases, and the other factors enunciated in Evans v. Sheraton Park Hotel, *supra*.

First, and perhaps most obviously, Mr. Wagshal has helped to confer a very substantial benefit upon the public in obtaining a declaration that the impoundment of one hundred twenty-five million dollars of funds destined for the RMPs was illegal and had to be stopped. Further, petitioner has greatly benefited the plaintiff class through release of over one hundred million dollars of impounded funds. Without this money most of the RMPs would have ceased to exist. To an extent petitioner did not himself create the amount of benefit since Congress had appropriated the monies in question. However, in post-February 1974 litigation petitioner materially assisted in preserving the benefits for the class by preventing defendants from diverting $30 million for other purposes. Further, petitioner benefited the plaintiff class by helping to assure continuation of their authority and operations, by assisting in obtaining funding during continuing resolutions, and by preventing the lapse of funds.

This impoundment case presented novel and complex issues which required considerable skill and diligence to resolve. Mr. Wagshal devoted much effort to structuring this case as a class action, indeed assisting in the formation of the National Association. He was laboring under an extreme time pressure constraint since there was danger that the impounded funds would lapse if preliminary relief were not obtained. When Mr. Wagshal was denied a temporary restraining order on September 28, 1973, he immediately instituted an emergency appeal and obtained injunctive relief for his clients in an extraordinary Sunday session before the Court of Appeals. Between September 30, 1973 and the entry of a final order on February 7, 1974, Mr. Wagshal was involved in briefing complex motions for summary judgment which involved great skill. It is to Mr. Wagshal's credit that he was successful in his efforts and obtained essentially full relief for his clients. After entry of the final order compelling obligation of all impounded funds, Mr. Wagshal was forced to litigate against efforts by defendants to divert $30 million to other purposes. This effort, involving extensive discovery and new, complex issues not raised earlier in the litigation, again required a great deal of skill and perseverance. In the end Mr. Wagshal succeeded in preserving all but $5 million of the amount defendants wanted to divert to other purposes and even that $5 million was allowed to be diverted only to specific other purposes. The foregoing is only a brief summary of the efforts of Mr. Wagshal in the merits of this litigation. They are set forth in greater detail in the affidavits and exhibits of this case. In sum, Mr. Wagshal has demonstrated a high degree of skill and has acted in the highest traditions of the Bar of this court in faithfully and doggedly representing his clients and bringing this case to a successful resolution.

In undertaking this work which so furthered the public interest the court believes it significant that when the RMPs looked for counsel to assist in opposing the illegal impoundment, no other counsel could be found. The RMPs sought assistance from various other counsel but none would accept the work because of the RMPs' inability to pay and the contingent nature of the litigation. Indeed, from the point of view of the start of the litigation—and Mr. Wagshal became involved initially in June, 1973—it was not at all obvious that the impoundments were illegal. Indeed, petitioner sought and initially was denied temporary relief and obtained the anti-lapse relief only by taking an emergency appeal. Clearly, this case at its outset presented real doubts as to ultimate success. Under petitioner's arrangement with his clients, he only would seek a fee from the RMPs if successful on the merits. Finally, in agreeing to take this case with a highly contingent outcome, petitioner has been denied the opportunity to take certain other cases because of the workload imposed by this case.

Given the preceding factors and particularly the great benefits conferred on the public, the great benefits conferred on plaintiff class, the skill demonstrated, and the contingent nature of the litigation at the outset, the court concludes that a substantial bonus is in order. In the *NCCMHC* case, a case involving fewer complex issues and taking less than half the time to resolve, Judge Gesell granted a bonus of 30 percent of the hourly fee. In other cases in this Circuit where issues were neither complex nor novel and required no great skill, incentive bonuses of 10 percent still have been approved. *See* Kiser v. Miller, *supra*; Larinoff v. United States, *supra*. In *Lindy, supra,* on remand, where the court determined that the attorneys had demonstrated great skill, faced real contingency, and had conferred great benefit upon the plaintiff class, the court ordered a 100 percent incentive bonus. In

this case, having many of the factors cited in *Lindy,* and after considering all of the foregoing, the court concludes that a 100 percent incentive bonus is in order for Mr. Wagshal for his work on the merits of the case; no incentive bonus is in order for his work on the fee application. This brings total compensation to the following:

| | |
|---|---|
| hourly compensation for work on merits | $49,000 |
| hourly compensation for work on fee | 7,500 |
| incentive bonus | 49,000 |
| | $105,500 |

In reaching this fee determination the court wishes to reiterate certain factors which it considers extremely important. First, in this case the court awards a fee which provides a fair prospect of remuneration to those members of the Bar who participate in public interest litigation on behalf of plaintiff classes. At the hearing on this fee application there was considerable evidence concerning the reluctance of members of the Bar to prosecute these cases. At the same time, the court is mindful that any fee award must not only satisfy the need of the Bar for adequate remuneration, it also must not appear to be unreasonably great to the public. When an attorney represents a class in public interest litigation, he represents a great deal more than his own interest. The Manual for Complex Litigation states as follows:

> Once adequate compensation sufficient to provide the motive for representation of classes is provided, no further incentive is required. In this connection, while any fee allowed in the case of a settlement or recovery through litigation may constitute a percentage of the total amount recovered, the reasonableness of the fee arrived at should not rest primarily on the selection of a percentage of the total recovery. Although the results obtained in representing the class should be given consideration as pro-

vided in the Code of Professional Responsibility, there should also be an emphasis upon the time and labor required and the effect of the allowance on the public interest and the reputation of the courts. In no event should representation of a judicially determined class be allowed on the same basis as in a contingent fee contract between competent contracting counsel and client.

1 Moore's Federal Practice, *supra* at 64. It is the court's conclusion that the fee arrived at in this case does provide sufficient motivation for representation of classes while at the same time it also can withstand public scrutiny.

## V. *Mechanics of Payment.*

There currently is $180,000 of unexpended direct operations funds deposited in the name and to the credit of the court. The court, as requested by petitioner, has decided that an appropriate attorney fee—$105,500—should be assessed against the benefiting class. The benefiting class members shall be ordered to pay Mr. Wagshal their *pro rata* share of the attorney fee. At the same time defendants shall be ordered to make available to plaintiff class members a similar amount of the unexpended funds currently held by defendants. This $105,000 received by the class members will assure that the RMP programs shall continue their programs with full effectiveness. The court finds it fully consistent with its judgment on the merits of this case to order defendants to obligate an additional $105,500 to the RMPs. This money, obligated originally to direct operations, was not needed for direct operations and thus the funds should go to the RMPs for their much-needed operations. The expenses of this litigation were unexpected but necessary expenses of the RMPs.

Since unexpended grant funds remain available, it is proper that each RMP's grant be enlarged by the amount of its unexpected legal expense.

The court will order that defendants make available to the RMPs the $105,500 within 30 days of the filing of this Order. Also, within 30 days of this Order each RMP shall remit its *pro rata* share of the attorney's fee to Mr. Wagshal. This payment by benefiting class members shall be made to the extent possible from non-grant funds.[3] If a grantee does not have sufficient non-grant funds to make its *pro rata* payment, it may then use grant funds. When Mr. Wagshal has received full payment, he will reimburse the National Association of Regional Medical Programs for the fees he has received from it.

---

3. Since the court in awarding this attorney fee is exercising its equitable powers, the court deems it desirable, to the extent possible, to avoid objection by all parties to this fee award. As stated previously, defendants do not object to any fee payment from non-grant funds so long as an RMP's operating effectiveness is unimpaired. The fee payment in this case should meet those objections, not hinder any RMP, and provide reasonable compensation to petitioner.