**Richard LEBANKS, through his mother Stella Mae Lebanks, Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Mack J. SPEARS et al., Defendants.**

**Civ. A. No. 71–2897.**

United States District Court, E. D. Louisiana.

June 23, 1976.

---

John W. Reed, New Orleans, La., Paul R. Dimond (Co-Counsel), Ann Arbor, Mich., for plaintiffs.

Paul J. Ferlita, Asst. Atty. Gen., Franklin V. Endom, Jr., New Orleans, La., Walter J. Horrell, Division of Health and Human Resources Administration, Baton Rouge, La., for defendants.

## DECISION ON MOTION OF PLAINTIFFS FOR AWARD OF ATTORNEYS' FEES

CASSIBRY, District Judge.

Plaintiffs seek attorneys' fees for time and skill expended by their counsel in bringing this litigation to a successful conclusion. The case was filed by the plaintiffs on behalf of all retarded children in New Orleans, Louisiana on October 1, 1971, seeking an increase in the delivery and availability of educational services to retarded children. On April 23, 1973, the first day of trial, a consent decree was entered into by the plaintiffs, the defendants Orleans Parish School Board (hereafter the Board), the State Board of Education, Louis J. Michot, Superintendent of Education, Charles C. Mary, Jr., M.D., Commissioner of Louisiana Health and Social and Rehabilitation Services Administration (HSR), and Otto P. Estes, Director, Division of Mental Retardation, HSR, effectively providing for the relief sought. 60 F.R.D. 135 (Charles C. Mary, Jr., has been succeeded by William H. Stewart). The Court approved the decree and certified the case as a class action. Although the consent decree provided for possible modification in January 1975, no modifications have been sought by any party.

The issue of the propriety of an award of attorneys' fees in this case has been argued to the Court on two occasions. In March 1975 the plaintiffs contended that an award was proper under statutory authority, 20 U.S.C. § 1617, and within the equitable power of the Court under the common benefit and private attorney general theories of attorney fee awards.[1] After the decision of the Supreme Court of the United States in May 1975 in *Alyeska Pipeline Service Company v. The Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141, rejecting the jurisprudence of the lower federal courts which had recognized the equitable power of the courts to include discretion to shift the costs of attorneys' fees of the prevailing party in federal question litigation to his adversary under the private attorney general theory, and holding that such fee shifting is improper without express statutory authorization, the plaintiffs in this case moved for permission to file additional briefs and reargue their motion in light of *Alyeska.* Upon reargument the private attorney general theory under the court's equitable powers has been abandoned and the plaintiffs now rely on statutory authority and the common benefit theory for recovery.

## STATUTORY AUTHORITY

Plaintiffs contend that statutory authority for an award of attorneys' fees in this case is provided in Section 718 of the Emergency School Aid Act of 1972, 20 U.S.C. § 1617, as follows:

> Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof) . . . for failure to comply with any provision of this chapter or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain

1. Fees for one of plaintiffs' attorneys, John W. Reed, formerly employed by the New Orleans Legal Assistance Corporation, is sought only for the time spent on the case since he entered private practice.

to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The plaintiffs contend that the consent decree in this case should be construed as a final order against a local educational agency and state agencies for discrimination on the basis of race, color or national origin in violation of the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education. The plaintiffs concede that the primary claim involved discrimination based on retardation, but aver that entwined with this issue was the disproportionate effect of the school board's practices on blacks and the employment of testing procedures and policies that were biased against blacks. They argue further that the racial issue is demonstrated by the participation of the Justice Department in the case and the order permitting participation of the United States of America as Amicus Curiae on March 21, 1973.

The defendant Board admits that plaintiffs initially claimed that they and the class they sought to represent had been discriminated against on the basis of race and injunctive relief was sought against such discrimination.[2] These initial claims were subsequently voluntarily dismissed, however, with the consent of the defendants.[3] A third amendment of the complaint included further assertions of racial discrimination, but no specific relief was prayed for in connection with the assertions.[4] All claims of race discrimination were thereafter expressly dismissed in the consent decree.[5] In spite of this clear dismissal of the racial discrimination claims, the plaintiffs argue that the consent decree should be construed as a final order against the Board for racial discrimination because the evaluation procedures set out in the

2. In paragraph 108 of the first amended complaint filed in 1971 it was asserted:

"The determinations made by defendants that plaintiffs and members of their class are mentally retarded are based on neither valid reasons nor ascertainable standards and are made pursuant to tests and procedures that are biased against Negroes; plaintiffs and their class have thereby been denied their right to an education in violation of the due process and equal protection clauses of the Fourteenth Amendment."

Paragraph 111 contained further assertion of racial discrimination:

"The provision by defendants of special education unequally to black and white retarded children has denied plaintiffs and their class the equal protection of the law in violation of the Fourteenth Amendment."

The following relief was prayed for in the first amended complaint:

"2) That this Court enter preliminary and permanent injunctions enjoining the defendants from:

a) Classifying the plaintiffs and members of their class as mentally retarded pursuant to procedures and standards that are arbitrary, capricious, and biased.

.     .     .     .     .

"d) Discriminating, in the allocation of opportunities for special education, between plaintiffs, and other black retarded children, and white retarded children."

3. In a second amendment of the complaint in 1972 this facet of the litigation was abandoned.

"Pursuant to Rule 15, F.R.C.P., and with the consent of the defendants, plaintiffs hereby amend their first amended complaint in the following respects.

1. To delete paragraphs 108 and 111 of their first amended complaint.

2. To delete from the Prayer of their first amended complaint paragraph 1 and paragraphs 2(a) and 2(d)."

4. Paragraphs 107 and 121 of the third amendment of the complaint charged as follows:

"107. "The Orleans Parish School Board's determinations that certain children are mentally retarded are arbitrary and are made without ascertainable standards or for valid reasons. The tests and procedures employed by the Orleans Parish School Board to determine retardation are biased against Negroes."

"121. On information and belief opportunities for retarded children are being distributed unequally between white and Negro children to the benefit of whites and to the deprivation of Negroes."

5. In the declarations in the consent agreement regarding the "Nature of the Consent Agreement" paragraph 11 provides:

"Race discrimination claims are dismissed without prejudice to the parties.

consent decree were specifically structured to prevent racial discrimination and to insure against racial bias in any subsequent assignment to special programs.[6] This provision of the consent decree to prevent racial discrimination and to *insure against* racial bias in *subsequent* action cannot reasonably be construed as an order against the Board *for* racial discrimination in view of the dismissal of claims of racial discrimination. Nor does the participation of the Justice Department as *Amicus Curiae* support the plaintiffs' position under these circumstances. This case, therefore, does not fall within 20 U.S.C. § 1617, and that statute is not authority for an award of attorneys' fees to plaintiffs.

## COMMON BENEFIT THEORY

The plaintiffs contend that the Court has the authority under the historic power of equity to award attorneys' fees in this case under the common benefit rationale which remains viable by express recognition in the majority opinion in *Alyeska*. The defendants deny that this case is within the common benefit rationale and urge that the plaintiffs are really seeking to shift the attorneys' fees to the losing party, which is the private attorney general rationale expressly rejected in *Alyeska*.[7]

*Alyeska* clearly repudiated the private attorney general rationale developed by the federal courts as contrary to the American rule, as compelled by the costs act of 1853, 10 Stat. 161, and its progeny (28 U.S.C. § 1923), that the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser. Congressional authorization is required under *Alyeska* for an award of attorneys' fees to those who have acted as private attorneys general

in promoting strong congressional policy. At the same time the Supreme Court recognized the common benefit or common fund rationale as one of the exceptions properly asserted under the "inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress . . . ."

"To be sure, the fee statutes have been construed to allow, in limited circumstances, a reasonable attorneys' fee to the prevailing party in excess of the small sums permitted by § 1923. In *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881), the 1853 Act was read as not interfering with the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the *fund or property itself or directly from* the other parties enjoying the benefit. That rule has been consistently followed. * * * *"

421 U.S. 240, 95 S.Ct. 1612, 1621 (1975). The Court effectively limited and contained the common benefit rationale when it rejected what it viewed as Mr. Justice Marshall's expanded version of the common fund approach to the awarding of attorneys' fees to those who have acted as private attorneys general.

"That condition [limiting condition of the common fund rationale to impose the burden on those who benefit from the enforcement of the law] ill suits litigation in which the purported benefits accrue to the general public. In this Court's common fund and common benefit decisions, the class of beneficiaries was small in number and easily identifiable. The ben-

---

**6.** Paragraph 22 of the consent decree contains the provision:

The evaluation shall . . .

b.  not result in a recommendation for placement in special classes for the retarded nor affixing the label retarded on any child in any way unless (1) he has an I. Q. on an individually administered I. Q. test of 69 or below, (2) he is substantially subnormal in adaptive behavior or measures to be agreed upon, and (3) he is still rated substantially subnormal

on both measures after the effects of socio-cultural background have been taken into account.

**7.** The State Board of Education and Louis J. Michot, Superintendent of Education, contend also that the Eleventh Amendment to the United States Constitution prevents any award of attorneys' fees against them. In view of the decision as to the common benefit rationale that issue is not reached.

efits could be traced with some accuracy, and there was reason for confidence that the costs could indeed be shifted with some exactitude to those benefitting. . . ." n. 39, 95 S.Ct. 1612, 1625.

In the classic Greenough common fund situation the beneficiaries are considered owners of the fund created or preserved by the litigation. Equity requires an award of fees to the plaintiff out of the fund to avoid unjust enrichment of the beneficiaries at the plaintiffs' expense. Such an award merely spreads the costs of the litigation among the beneficiaries, and does not serve to shift the costs of attorneys' fees to the loser. See Dawson, Lawyers and Involuntary Clients: Attorneys' Fees from Funds, 87 Harv.L.Rev. 1597 (1974).

The plaintiffs admit that no fund has been created or preserved by this litigation, but they argue that this case is within the common fund theory as extended in *Mills v. Electric-Auto Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), and *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), to include a common benefit situation. In *Mills* a plaintiffs' stockholder derivative suit was regarded as conferring a non-monetary benefit on all the shareholders and the corporation, and the corporate treasury was a fund common to the class benefitting from the litigation, the corporate shareholders, from which an award of attorneys' fees was made under an expanded common benefit rationale. In *Hall* an award of attorneys' fees from a union treasury was allowed to a union member whose successful suit secured his right of free speech and at the same time removed the chill case upon the free speech rights of other union members. The Court considered that payment of fees from the union treasury spread the costs to the class that benefitted from the litigation, the other union members.

*Mills* and *Hall*, and the discussion of the common fund theory in *Alyeska*, require for an award of attorneys' fees under the common benefit rationale (1) an ascertainable class of beneficiaries, easily identifiable, and (2) a source of funds common to the class from which the award can be made. Public interest litigation generally cannot meet these requirements.[8] Actions to vindicate constitutional rights which benefit the public usually can present only the "private attorney general" theory for the award of attorneys' fees.[9] Prevailing parties in public interest litigation ought not to be permitted, by emphasizing the importance of enforcing constitutional rights, to attach the "common benefit" label to what is really the "private attorney general" theory, and ultimately to merge the two theories.[10]

Plaintiffs in this case emphasize at length the benefits of this litigation for the plaintiff class of all children suspected of

---

**8.** "In the final analysis, the 'common fund' theory is attuned to business or commercial litigation. * * * It is ill suited to equitable actions against governmental bodies or officers." *Seaman v. Spring Lake Park Ind. Sch. Dist., No. 16*, 387 F.Supp. 1168 (D.C.Minn.1974); see also *"TOOR" v. United States Dep't of "HUD"*, 406 F.Supp. 960, 967 (N.D.Cal.1975).

"* * * there would appear to be relatively few cases [enforcing public policy] to which the Court would hold the common benefit principle applicable, other than shareholders' derivative actions as in *Mills*, and suits against union officials by union members, as in *Hall*." The Supreme Court, 1974 Term, 89 Harv.L.Rev. 49, 181.

"* * * Most litigation does not fall within the bad faith or common fund situations, and thus any fee-shifting would truly be between 'party and party' and therefore prohibited by the fee bill statute." Note, 7 Texas Tech.L.Rev. 122, 132 (1975).

Certain public benefit litigation can meet the requirements for application of the common benefit theory. See, for example, *National Association of Regional Medical Programs, Inc. v. Weinberger*, 396 F.Supp. 842 (D.C.D.C.1975); see generally Dawson, Lawyers and Involuntary Clients in Public Interest Litigation, 88 Harv.L.Rev. 849, 916–922 (1975); Comment, 6 Env.L. 243, 253 (1975).

**9.** *Thomas v. Ward*, 529 F.2d 916 (4th Cir. 1975).

**10.** See *Satoskar v. Indian Real Estate Commission*, 517 F.2d 696 (7th Cir. 1975); *Samuel v. University of Pittsburg*, 395 F.Supp. 1275 (W.D.Pa.1975); *"TOOR" v. United States Dep't of "HUD", supra*, at p. 965.

being retarded, for all of the school children of Orleans Parish and for the School District of Orleans Parish.[11] The direct beneficiaries of this litigation, however, are only those children in Orleans Parish suspected of being retarded. All of the school children of Orleans Parish and the school district are indirect beneficiaries of this litigation and cannot be regarded as recipients of the "substantial benefit" contemplated by Mills for application of the common benefit theory. It is questionable that an open-ended group of beneficiaries such as "all those children in Orleans Parish suspected of being retarded" meets the test of an ascertainable class, easily identifiable. In *Burbank v. Twomey*, 520 F.2d 744 (7th Cir. 1975) all the prisoners in Illinois was too indefinite a class to permit recovery of attorneys' fees under the common fund theory. See also *Townsend v. Edelman*, 518 F.2d 116 (7th Cir. 1975); *Rasmussen v. City of Lake Forest, Illinois*, 404 F.Supp. 148 (N.D.Ill.1975).

More serious to the application of the common benefit rationale is the lack of a source of funds common to the class benefitting from this litigation from which an award of attorneys' fees can be made. The resources of public funds of the defendants cannot be regarded as a common fund belonging to those children of Orleans Parish suspected of being retarded. Assessing attorneys' fees against public funds thereby imposing a share of the cost on many citizens, and not just those directly benefitted by the public interest litigation is beyond the rationale of the common benefit theory of *Mills* and *Hall*. See *Satoskar v. Indian Real Estate Commission, supra*. And when a fund is allocable to the public as a whole as opposed to the class benefitted by public interest litigation, the common benefit or common fund rationale is inappropriate.[12] See *Townsend v. Edelman, supra*.

The argument of plaintiffs that the local school district defendant is a representative of the beneficiaries of this litigation and therefore its resources are a proper fund from which an award of attorneys' fees can be made is outside the basic rationale of *Mills* and *Hall*.[13] An award of attorneys'

11. In connection with their recitation of the monetary benefits accruing to the retarded child from this litigation (free public instruction rather than costly private tutoring, schooling, or institutionalization), the plaintiffs argue that "In analogous circumstances, the Fourth Circuit ordered attorneys' fees awarded to plaintiffs from a local school district for securing free transportation to school for students from the district, worth $60 per student." *Brewer v. School Board*, 456 F.2d 943, 951–2 (1972), *cert. denied* 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136. That case cannot be regarded as a proper expansion of the "common fund" theory. In *"TOOR" v. United States Dep't of "HUD", supra*, n. 8, the court said, "* * * The Brewer Court acknowledged that the award of fees was based upon a 'quasi-application' of the common fund exception. The Brewer case is unique in its extension of the common fund theory and no comparable decision has been reported since 1972."

12. A contrary view has been taken by a district court in this circuit. *Miller v. Carson*, 401 F.Supp. 835 (M.D.Fla.1975). In that case the Court agreed with the plaintiffs for a class consisting of all persons who are presently, or in the future will be, incarcerated in the Duval County Jail, Jacksonville, Florida, who were successful in vindicating constitutional rights of the prisoners by compelling improvement of conditions existing at the jail, that the common benefit doctrine was an appropriate theory upon which to base an award of attorneys' fees against officials of the Consolidated City of Jacksonville, Florida. "The analogy between minority shareholders suing to vindicate their common law corporate rights and the plaintiff in this case, who are suing to vindicate their constitutional rights, is a viable one. * * * The fact that they have sought and obtained a ruling, which was never appealed, in their favor which vindicates their constitutional and statutory rights is sufficient under *Mills* to justify an award of attorneys' fees." Id., p. 852. That the prisoners could only be regarded as part owners of the body corporate, the City, was considered sufficient for an award under *Mills*. This case was heard on appeal by a panel of the Fifth Circuit on March 11, 1976 and is now submitted for decision. Docket No. 75–2739. The district court found that an award of attorneys' fees was also appropriate under the "bad faith" exception to the "American Rule" recognized in *Alyeska*. Reversal of this finding is also sought on the appeal.

13. The plaintiffs have expressed that they are not seeking an award against the plaintiff class for the benefits conferred upon it by the litigation because the class consists of minors large-

fees from these resources cannot be made with any confidence that the costs of this litigation would thereby be shifted with any exactitude to those benefitting.[14] This case therefore does not meet the requirements of the common benefit rationale for making an award of attorneys' fees.

The motion for award of attorneys' fees is DENIED.

---

ly devoid of resources, and they regard the Orleans Parish School District as the most appropriate representative body against whom a fee award should be made.

**14.** In two cases since *Alyeska*, vindicating the constitutional rights of plaintiffs the Court of Appeals, Fifth Circuit, has held that an award of attorneys' fees out of the resources of the defendants would not serve to spread the costs of the litigation among those who benefitted from it. *Wallace v. House*, 5 Cir., 515 F.2d 619 (1975); *Hander v. San Jacinto Junior College*, 5 Cir., 519 F.2d 273 (1975).