[Civ. No. 40491. First Dist., Div. Two. Oct. 30, 1978.]

WILLIAM T. WERSCHKULL et al., Plaintiffs and Appellants, v. UNITED CALIFORNIA BANK, Defendant and Appellant.

984

## COUNSEL

Charles P. Scully, Donald C. Carroll and Stephen G. Schrey, for Plaintiffs and Appellants.

Severson, Werson, Berke & Melchior, Edmund T. King II and Jan T. Chilton for Defendant and Appellant.

## OPINION

ROUSE, J.—Plaintiffs, who are participants in an employees' pension plan, brought this class action against defendant United California Bank (UCB), trustee of the plan, to obtain a judicial declaration that UCB's 1962 amendment to the plan and its conduct pursuant to that amendment had resulted in a wrongful diversion of pension trust funds. It was also alleged that UCB had fraudulently concealed from plaintiffs the existence of the 1962 amendment and the wrongful actions taken pursuant to said

amendment. In addition to declaratory relief, plaintiffs sought an accounting, the restoration of all wrongfully diverted pension trust funds, and a judicial decree for an increase in plaintiffs' pensions or other suitable distribution of funds to plaintiffs. Plaintiffs also prayed for compensatory damages, attorney's fees, and punitive damages based upon UCB's fraudulent concealment of the facts.

Pursuant to the agreement of the parties and the pretrial conference order, the issues were trifurcated for trial. The first phase of the trial was held before the court, sitting without a jury. The issue to be decided at this phase of the trial was whether the 1962 amendment to the pension plan was valid under the provisions of the plan itself and under applicable law.

The evidence considered at the first phase of the trial consisted of an agreed statement of facts, a list of trial exhibits and oral testimony of an expert witness called by plaintiffs. Also, written briefs were filed by both sides. The parties' agreed statement and the pertinent documentary exhibits established that the San Francisco Bank Employees' Retirement Plan (SFB Plan) was created by the San Francisco Bank effective January 1, 1944. The SFB Plan provided for contributions by the bank into a pension trust fund to be administered by the bank, as trustee. The last two paragraphs of section 8 of the SFB Plan provided that "No part of the pension trust fund shall, at any time prior to the satisfaction of all liabilities with respect to members, former members, and their beneficiaries under said trust, be used for, or diverted to, purposes other than for the exclusive benefit of members, former members, and their beneficiaries.

"Upon discontinuance of the Plan and termination of said trust, the present value, at the time of such discontinuance and termination, of all pensions or prospective pensions of members, former members, and their beneficiaries under the Plan, on account of credited service prior to such discontinuance and termination shall be actuarially calculated and the pension trust fund shall thereafter be held for the exclusive benefit of each of such members, former members, and their beneficiaries in the same proportions as the actuarially calculated present values of their accrued pensions or prospective pensions bear to each other; provided, however, that the Bank reserves the right to recover at any such discontinuance and termination, and only at such discontinuance and termination, such balance in the pension trust fund after satisfying all liabilities hereunder as is due to erroneous actuarial computations;

provided, further, that the pension trust fund shall be distributed to the persons then entitled thereto in cash, or in the form of contracts with, or annuities from, any insurance company or insurance companies, as may be determined by the Pension Committee. All distributions made hereunder shall discharge the Bank, as trustee of said trust, to the extent of the amount distributed."

Section 10 of the plan provided that "Subject to the provisions of the last two paragraphs of Section 8," the provisions of the plan could be amended by the bank at any time and in any respect.

In 1954, the San Francisco Bank became the First Western Bank and Trust Company (First Western), and the SFB Plan continued to be administered by First Western as trustee for the beneficiaries of the SFB Plan. The SFB Plan was amended in 1954, but the amendment did not affect section 8 of the plan.

In July 1960, First Western created the First Western Bank and Trust Company Retirement Plan (First Western Plan), which contained the following provision: "The San Francisco Bank plan, which is hereby incorporated herein by reference, shall continue to be administered and accounted for separately but shall nevertheless be deemed, after the amendment date, to be a part of the single overall retirement plan and trust of the Bank, as evidenced hereby."

In the first half of 1961, First Western and the California Bank entered into a merger agreement with the result that the California Bank emerged as the surviving bank and with a name change to United California Bank (UCB). UCB and First Western were both subsidiaries of Firstamerica Corporation, which is now Western Bancorporation. From the time of the merger until the present, Western Bancorporation has owned virtually all of the stock of UCB. In 1961, Western Bancorporation established the Retirement Plan for Employees of Western Bancorporation and its Affiliated Banks (Western Plan) and the Supplemental Retirement Plan for Employees of Western Bancorporation and its Affiliated Banks (Supplemental Plan), with both plans to become effective on January 1, 1962.

On September 18, 1961, the board of directors of UCB approved and adopted, effective January 1, 1962, the Western Plan and the Supplemental Plan and also authorized the preparation of amendments to other existing pension plans, including the SFB Plan, in order to insure, among

other things, that no further benefits would accrue under those plans after December 31, 1961. The Western Plan contained the following provision: "D-4. The Trustee may accept as a part of the trust fund any assets which may be transferred to the Trustee as the successor trustee under any other qualified trust maintained for the benefit of the employees of any participating employer. Such assets will be administered by the Trustee together with the other assets of the trust fund as one fund, except that the Trustee may not commingle such assets with the other assets of the trust fund unless the trust instrument under which such assets are held permits such commingling."

On November 20, 1961, UCB's board of directors approved and adopted amendments to the First Western Plan and the SFB Plan. These amendments provided that, subsequent to December 31, 1961, no employee could become a member of either the First Western Plan or the SFB Plan and UCB would no longer make contributions to either plan. Future eligibility of employees was to be under the Western Plan and the Supplemental Plan. Section 8 of the SFB Plan was amended to add the following final paragraph: "At any time after December 31, 1961 all of the assets of the pension trust fund may, by direction of the Pension Committee, be transferred to the trust fund under the Retirement Plan for Employees of Western Bancorporation and its Affiliated Banks, effective January 1, 1962, of which trust fund the Bank is trustee. Thereafter such assets shall continue to be used to provide benefits under the Plan but shall be administered by said trustee together with the other assets of the trust fund under said Retirement Plan as one fund and said trustee is hereby specifically authorized to commingle such assets with the other assets of such trust fund. Said trustee shall keep such separate accounts with respect to the assets so transferred as may be required to permit a determination at the end of any calendar quarter as to what portion of such trust fund is equitably attributable to the assets so transferred and shall retransfer such equitable portion to the pension trust fund as of any such date if instructed to do so by the Pension Committee. If the value of such equitable portion of such trust fund at any time, as determined by the Pension Committee, exceeds the liabilities of the pension trust fund, and if the conditions referred to in the second paragraph of Section 10 continue to be met, the amount of the excess shall remain in such trust fund and shall be credited against the contributions payable by the Bank to such trust fund."

However, the SFB Plan was not to be terminated, and the 1962 amendment provided that said plan would not be "discontinued" as long

as (1) the full current costs were met, (2) UCB was a participating employer in the Western Plan and the Supplemental Plan, and (3) those latter plans remained in effect.

Under the 1962 amendment those employees who were already members of the SFB Plan would continue to be covered under that plan but would earn no more credits under that plan. For ongoing service, they would begin earning credits under the Western Plan and the Supplemental Plan.

On May 28, 1963, UCB's actuarial consultants, Coates, Herfurth and England, supplied UCB with the following information concerning the valuation of the SFB Plan as of January 1, 1963: "In our valuation, based on 154 members who have not yet retired and 61 ·who have already retired, we find that the liability on the basis of the current actuarial assumptions is $2,481,000. The trust report furnished us as of the same date showed assets of $2,963,000."

On August 23, 1963, pursuant to the 1962 amendment to the SFB Plan, UCB, as trustee, directed that the assets of the SFB Plan trust be transferred to the trust fund of the Western Plan. On the same date, the UCB retirement committee authorized the crediting of $482,000 in SFB trust fund assets against the contributions payable by UCB to the Western trust fund.

A second instance of crediting, in the amount of $100,000, was authorized by the retirement committee on September 28, 1964. This action was also taken.

The third and final instance of crediting against SFB trust fund assets was authorized by the retirement committee on November 18, 1968, and the sum of $180,000.90 was thereafter credited against contributions payable by UCB to the Western Plan trust fund.

With respect to all three instances of crediting, the subsequent investment income thereon was allocated to the account of UCB under the Western Plan, and the amounts credited were claimed as business expense deductions upon UCB's corporate tax returns.

As of May 24, 1972, Coates, Herfurth and England advised UCB that on the basis of the membership data available to that firm, it had

determined that liability for benefits provided by the SFB Plan was $1,850,139 as of January 1, 1972, and that the total trust assets had a book value of $2,242,153.66 and a market value of $2,232,583.15.

Plaintiffs called Barthus Prien, an actuary, as a witness during the first phase of the trial. Mr. Prien testified that the liabilities of a pension plan and trust could not be deemed satisfied without a termination and discontinuation of the plan and trust. He stated that if an actuary such as himself determined that the assets of a particular pension plan were greater than the amount of its liabilities, the actuary still could not certify that the liabilities had been satisfied so long as the plan had not been terminated. He further stated that his answer would be the same in the case of a pension plan which had been frozen so as to preclude employees from earning any future credits under said plan. Mr. Prien testified that virtually every pension plan that he had ever seen provided that the funds in the pension trust could not be used for any purpose other than the exclusive benefit of the plan members and beneficiaries. It was his opinion therefore that if the real value of the assets of a frozen pension plan exceeded its liabilities prior to the termination of such plan, the employer's use of such funds for any purpose other than the benefit of the plan members and beneficiaries would be a prohibited transaction in violation of the terms of the plan. Mr. Prien stated that in the case of a plan which had been closed so that no new employees could join, one method of solving the problem of an excess of assets over liabilities would be to terminate the plan. Another possibility would be to improve the benefits offered by the plan. Mr. Prien was asked whether an employer who had closed a pension plan from further participation and had frozen the earnings of further credits under such plan would then be entitled to use the excess assets of that plan to reduce the employer's contributions to another unrelated pension plan. He replied, "That would be a diversion of funds and it would be discriminating to the old group to take money on their behalf away from them and give it to another group." Mr. Prien testified that in instances where actuarial error had resulted in an excess of assets over the liabilities of a particular pension plan, such excess could be diverted to other uses by the employer only upon termination of the plan. In Mr. Prien's opinion, the 1962 amendment to the SFB Plan, whereby UCB was permitted to credit the excess assets of said plan against the contributions payable by UCB to the Western Plan, authorized a diversion of funds for purposes other than the exclusive benefit of SFB Plan members and beneficiaries. Since the SFB Plan had not been terminated, there had been no satisfaction of its liabilities.

Plaintiffs also read into evidence a portion of the deposition of one of UCB's actuarial consultants, Mr. England, to the effect that as of September 18, 1964, he did not consider that there had been a satisfaction of the liabilities of the SFB Plan.

No witness was called by UCB during the first phase of the trial.

At the conclusion of the first phase of the trial, the court rendered detailed findings of fact and conclusions of law. The court determined that UCB's 1962 amendment to section 8 of the SFB Plan and its conduct pursuant to said amendment were invalid as in violation of the last two paragraphs of section 8, as originally adopted. The court further concluded that the amendment in question and UCB's conduct pursuant to same were in violation of sections 2229 and 2231 of the Civil Code and section 1591 of the Financial Code.

At the second phase of the trial, which was had before a jury, the issue to be determined was whether plaintiffs were entitled to recover punitive damages based upon UCB's allegedly fraudulent concealment from plaintiffs of the 1962 amendment and concealment of its conduct pursuant to said amendment. At the conclusion of this phase of the trial, the jury was asked to answer the following three special interrogatories: (1) Did UCB know it had a duty to disclose the 1962 amendment and the three instances of crediting and know that it was falsely concealing and suppressing said facts? (2) Did UCB conceal and suppress said facts with the fraudulent intent to deceive plaintiffs and deprive them of something to which they were entitled? (3) Did plaintiffs suffer actual damage as a direct result of fraudulent concealment and suppression by UCB? The jury answered all three interrogatories in the affirmative and awarded plaintiffs punitive damages in the amount of $550,000.

The third phase of the trial, like the first, was had before the court, sitting without a jury. This phase of the trial involved the issues of whether UCB should be ordered to retransfer the actuarial excesses and their profits back to the SFB Plan trust, whether actual damages should be assessed, and whether UCB could be ordered to pay plaintiffs increased pensions.

The court initially entered an interlocutory order directing UCB to retransfer the actuarial excesses, together with 7 percent interest thereon, to the SFB Plan and to exercise its discretion with regard to increasing plaintiffs' pensions.

Thereafter, UCB informed the court that it had not retransferred the actuarial excesses to the SFB Plan and that it had exercised its discretion and would not increase plaintiffs' pensions either prospectively or retrospectively. The trial court then orally announced that it had determined that plaintiffs had suffered actual damages as the result of the wrongful transfers of the SFB Plan funds, since such transfers had made it impossible for UCB to exercise its discretion to increase plaintiffs' pensions. However, the court further stated that it had no means of ascertaining the amount of the damages sustained by plaintiffs, since it was impossible to know what pension increases, if any, would have been granted by UCB had it not made the wrongful transfers from the SFB Plan. The court stated that it would fix plaintiffs' actual damages at $1, but that "The amount of one dollar is not intended in any way to indicate the opinion on the part of this Court that the damage was insignificant or nominal. It is merely because the Court is reluctant to arbitrarily pick a dollar amount in excess of one dollar." The court also announced that it was awarding plaintiffs attorney's fees in the amount of $400,000 for legal services rendered to date.

Judgment was rendered declaring the 1962 amendment to the SFB Plan to be invalid; restraining UCB and its agents from giving effect to that amendment; ordering UCB to return to the SFB Plan trust fund the sum of $762,000, plus 7 percent interest from the dates of the wrongful diversions from said trust; and awarding plaintiffs actual damages in the amount of $1 and punitive damages in the amount of $550,000. Also, the court ordered that attorney's fees in the amount of $400,000 be paid from the SFB Plan trust fund.

The judgment was later amended to take account of the claims of certain class members who had been late in filing their claims.

UCB filed a notice of appeal from the judgment, the amended judgment and the order denying its motion for judgment notwithstanding the verdict.[1] Plaintiffs filed a notice of appeal from those portions of the judgment which fixed plaintiffs' actual damages at $1 and denied them an order directing UCB to increase their pensions.

■ UCB's initial contention on appeal is that the trial court erred in determining that the 1962 amendment to the SFB Plan and UCB's

---

[1]UCB also purports to appeal from "any and all interlocutory orders and rulings which are a part of" the judgments appealed from. Such preliminary orders and rulings are nonappealable.

conduct pursuant to said amendment were invalid. UCB asserts that employee pension plans and trusts are very special entities which are creatures of the federal income tax law and are designed to insure substantial tax benefits to both employers and employees. UCB also argues that overfunding of a pension plan is a factor which might jeopardize the tax-exempt status of such a plan and that once it became evident that the assets of the SFB Plan substantially exceeded its liabilities, it was in the interest of both UCB and the members of the plan that steps be taken to correct this problem. UCB asserts that one permissible method of solving the overfunding problem would have been for UCB to keep the SFB Plan operative in the future and decrease or eliminate UCB's contributions to such plan. UCB also points out that the SFB Plan was funded solely through employer contributions and that the plan provided for fixed pension benefits which were limited to a defined dollar amount derived through computations based upon the employees' years of service and salary. UCB (and its predecessors) were the trustors as well as the trustees of the plan, and section 8 of the plan specifically provided that upon termination of the plan and after satisfying all liabilities thereunder, the trustor was entitled to retain for its own use any balance which might remain in the fund due to erroneous actuarial computations. Since section 8 also authorized UCB to terminate the trust "at any time," UCB asserts that it could have solved the overfunding problem by terminating the SFB plan in 1962, paying the beneficiaries the present cash value of their pension rights or purchasing annuity contracts for them, and retaining for its own use all of the actuarial excesses generated by the fund. UCB takes the position that since there can be no question but that it could have utilized the actuarial excesses for its own purposes by terminating the SFB Plan, it should not be penalized because it chose to accomplish the same objective while keeping that plan alive. Stated somewhat differently, UCB claims that plaintiffs' rights in the trust fund were in no way affected by the 1962 amendment and the three diversions of funds made pursuant to that amendment. According to UCB, plaintiffs at no time had any interest in the actuarial excesses generated by the fund. They were entitled only to receive pensions computed in accordance with the terms of the plan; hence, the judgment directing UCB to restore the actuarial excesses to the SFB Plan will not result in any benefit to plaintiffs, whose pensions will remain the same, but may well have a deleterious effect on plaintiffs as well as UCB by creating an overfunding situation which will threaten the tax-exempt status of the SFB Plan. UCB asserts that the trial court incorrectly confined its analysis to the "plain meaning" of the SFB Plan and an overly literal application of general trust law principles and

improperly refused to consider the SFB Plan in the context of the federal income tax laws which govern employee benefit trusts. It contends that the 1962 amendment to the SFB Plan and the diversions thereafter made by UCB were entirely proper under federal income tax law as "intra-plan" transfers, since the SFB Plan and the Western Plan and Supplemental Plan should all properly be deemed part of one overall plan for the benefit of all employees of Western Bancorporation and its affiliated banks.

UCB bases these arguments primarily upon its analysis of former section 165(a)(2) (26 U.S.C.A. § 165(a)(2)) of the Internal Revenue Code of 1939, the regulations and rulings interpreting same, and one case decided by the Minnesota Supreme Court, *St. Paul Electrical Workers Welfare F.* v. *Cartier* (1969) 283 Minn. 212 [167 N.W.2d 131].

It appears that the language of section 8 of the SFB Plan, which prohibits a diversion of trust funds for any purpose other than the exclusive benefit of members, former members and their beneficiaries, was drafted in order to meet the requirements of former section 165(a)(2) of the Internal Revenue Code of 1939. That statute, as originally enacted, provided, in pertinent part, that "A trust forming part of a . . . pension . . . plan of an employer for the exclusive benefit of his employees or their beneficiaries shall not be taxable under this supplement and no other provision of this supplement shall apply with respect to such trust or to its beneficiary— . . .[¶] (2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries; . . ."

UCB points out that in 1943, the Internal Revenue Service changed its interpretation of section 165(a)(2) by deleting from the regulations interpreting that statute the following sentence: "The diversion of substantial amounts of trust funds from one group of employees to another group of employees is not for the 'exclusive' benefit of employees even though both groups were covered by the trust, if the employer (or other nonemployee) receives substantial indirect benefit thereby, as, for example, through securing greater loyalty from the favored group, or through the shifting of expected pension benefits to a younger group and the postponement of part of the employer's contributions to a later date. (Reg. Art. 165-1(d) (1939). Compare Reg. 103, §19.165 (a)(2)-1(a) (1943).)"

According to UCB, the 1943 deletion constituted a determination by the Internal Revenue Service that intra-plan transfers would no longer be prohibited. UCB further asserts that the propriety of intra-plan transfers was confirmed by the Internal Revenue Service in 1968 when it rendered its Revenue Ruling 68-242 and there held that an employer "who has in effect a single qualified plan funded through several group annuity contracts for the exclusive benefit of his salaried and wage-earning employees or their beneficiaries" was entitled to transfer an actuarial excess of funds from the contract covering wage-earning employees to a similar contract covering salaried employees in order to meet the unfunded past and current service obligations under the transferee contract.

In 1973, the Internal Revenue Service reaffirmed this determination in Revenue Ruling 73-534, wherein it held a transfer between two plans to be invalid, but took pains to distinguish its earlier ruling: "In Rev. Rul. 68-242 both annuity contracts were issued under a single qualified plan. Thus, there was no diversion of funds but rather a reallocation of funds being held for the benefit of one group of employees, whose benefits were being adequately funded, to the benefit of another group of employees under the same plan."

UCB concludes from such analysis that, at all times subsequent to 1943, former section 165(a)(2) of the Internal Revenue Code, as properly construed, did not prohibit intra-plan transfers of actuarial excesses. UCB asserts that since the SFB Plan was created in 1944 and the language in the plan prohibiting diversions of funds was based upon section 165(a)(2), that language should likewise be construed as authorizing intra-plan transfers. It further contends that the diversions in this instance were intra-plan transfers because the SFB Plan, together with the Western Plan and the Supplemental Plan, all constitute one overall pension plan for the benefit of all employees of Western Bancorporation and its affiliated banks.

In further support of its position, UCB relies upon *St. Paul Electrical Workers Welfare F. v. Cartier, supra,* 167 N.W.2d 131. In that case, a welfare trust for employees was created in 1950 and thereafter maintained pursuant to collective bargaining agreements between the union and the employers. The welfare trust was administered by six trustees, three of whom were selected by the union and three by the employers. The trust funds came primarily from the contributions of the employers, and the trust agreement required the trustees to hold the funds " 'in trust

for the use and purpose herein provided, and for no other uses and purposes.' " However, the agreement also conferred upon the trustees broad powers to allocate and reallocate the assets and income of the fund and contributions thereto for the purpose of providing the benefits for which the trust fund had been created. The trustees were also given sole and exclusive discretion to determine the " 'kind, number and types' " of the welfare benefits to be accorded to the beneficiaries. (P. 134.)

The welfare trust originally provided hospital and medical benefits and total and permanent disability benefits, and in 1958, retirement benefits were added. It developed that the retirement program was not actuarily sound, but that surpluses had accumulated due to the fact that total and permanent disability became stabilized. Tax counsel for the welfare fund became concerned that these surpluses might jeopardize the tax-exempt status of the fund; also, it was thought that a separate and more formalized pension fund would provide a safer and more sound vehicle for providing retirement benefits. Therefore, the trustees, with the concurrence of the union and the employers, created a separate pension fund, discontinued the pension benefits under the welfare trust and transferred the sum of $600,000 to the new pension fund, which sum represented surpluses which had accumulated on the funds set aside for disability benefits.

An employee-beneficiary under the welfare and pension trusts objected to this transfer of funds and contended that it violated the welfare trust agreement and the statutory and common law rules governing the duties of trustees. The trial court rejected this argument and was upheld by the Minnesota Supreme Court, which concluded that the transfer of the surplus funds to the pension fund would provide retirement benefits to the beneficiaries eligible for retirement under the welfare fund and would effectuate the purposes of the welfare fund; that the transfer was for the best interests and the benefit of the welfare fund and its beneficiaries and would do no substantial injury to any person beneficially interested in that fund; that the trustees had not abused their discretion. (P. 136.)

The *St. Paul* case is readily distinguishable from the facts of this case. For example, in *St. Paul, supra,* the transfer of surplus funds to the newly created pension fund benefited the same employees who were covered by the welfare fund. Here, the transfer of surplus funds to the Western Plan benefited employees who were not members or beneficiaries under the SFB Plan, yet failed to provide any new or additional benefits for those few remaining persons who *were* members of the SFB Plan. Also, in *St.*

*Paul, supra,* the Minnesota Supreme Court emphasized the fact that the funds in question were entitled to special treatment because they were the product of collective bargaining and the situation was one where the transfer of funds was authorized by trustees who represented both the employer and the employees and by the employers and the union, who were the settlors of the welfare fund. In the instant case, the 1962 amendment which authorized the transfer of surplus funds from the SFB Plan to the Western Plan was not the product of collective bargaining. It was, instead, a unilateral act by UCB, undertaken and carried out without notice to or consultation with any of the members of the SFB Plan.

In reply to defendant's arguments, plaintiffs point out that during the first phase of the trial, UCB neither produced any evidence nor made any claim that its primary purpose in authorizing and making the diversions was to solve an overfunding problem which could have jeopardized the tax-exempt status of the SFB Plan. It is clear, say plaintiffs, that UCB was not in the least desirous of eliminating the overfunding problem; that it deliberately took steps designed to insure that the SFB Plan would continue to accumulate excess funds, which UCB could then skim off from time to time and credit against the contributions payable by UCB into the Western Plan trust. It is plaintiffs' position that if UCB had been genuinely interested in solving the overfunding problem, it could have kept the SFB Plan operative in the future and increased plaintiffs' benefits and/or decreased or eliminated its (i.e., UCB's) contributions to the fund. Alternatively, UCB could have terminated the SFB Plan and purchased insurance annuities for plaintiffs. Plaintiffs assert that UCB took neither step because it wished to keep the plan alive in order to utilize the plan's excess earnings for its own purposes and thereby receive favorable tax treatment. Plaintiffs observe that UCB took steps designed to reduce the future liabilities of the SFB Plan by providing that, commencing in 1962, no employee could become a member of the plan and that employees who were already members of the plan could earn no additional pension credits under the plan. By the taking of these steps and by its failure to terminate the SFB Plan, UCB insured that the overfunding problem would continue to exist in the future to generate income far in excess of its liabilities. Plaintiffs point out that this was in fact the case and that after UCB purportedly "solved" the overfunding problem by diverting $482,000 in 1963, excess assets continued to accumulate, in the amount of an additional $100,000 by 1964, another $180,000 in 1968, and a further $500,000 as of the end of 1974. According to plaintiffs, these results were precisely what UCB anticipated and desired, that "the Plan was an overfunded plum in 1962 and known to be

so," that "The [1962] amendment created and/or perpetuated the conditions by which excesses arose," and that UCB, "by virtue of the same amendment could then skim them off for its own use."

Plaintiffs contend that UCB's actions were clearly in violation of the SFB Plan provision prohibiting the diversion of trust funds for any purpose other than the benefit of plan members and beneficiaries; they deny that the authorities cited by UCB lend any support for the contrary conclusion. Insofar as UCB contends that the anti-diversion provision of the SFB Plan should be interpreted in accordance with section 165 (a)(2) and Revenue Ruling 68-242 to permit intra-plan transfers, plaintiffs deny that we are here confronted with an intra-plan transfer. The SFB Plan has never been incorporated into the Western Plan or Supplemental Plan; instead, the SFB Plan has always retained its own separate existence, and its assets have always been separately accounted for. Plaintiffs assert that it was part of UCB's purpose to maintain the SFB Plan as a separate entity because it was only by doing so that UCB could transfer actuarial excesses from the SFB Plan into the Western Plan, in lieu of contributions by UCB, and claim the funds so transferred as business expense deductions. Plaintiffs also point out that the beneficiaries of the SFB Plan and the Western and Supplemental Plans were not the same. Obviously, individuals who had already retired under the SFB Plan would never acquire benefits under the other two plans. Likewise, the benefits of the SFB Plan were available only to persons who had joined that plan prior to 1962. Even in the case of those members of the SFB Plan who continued in UCB's employment subsequent to 1962, there was no merging of their rights under the two plans; they simply had credits under the SFB Plan for services rendered prior to 1962 and credits under the Western Plan or Supplemental Plan for services rendered thereafter. Under these circumstances, argue plaintiffs, there is no merit to UCB's claim that the diversions of funds were proper as intra-plan transfers.

Plaintiffs' reasoning is persuasive and effectively defeats UCB's claim that the diversions made pursuant to the 1962 amendment were intra-plan transfers which were not in violation of the SFB Plan. The trial court found that the SFB Plan and trust had not been terminated or discontinued at the time of UCB's diversions or, indeed, at any time thereafter. The court further found that in making the diversions, ". . . U.C.B. has used part of the trust corpus of the SFB Plan for its own use and benefit as a direct dollar for dollar reduction on its current contributions as a participating employer to the Western Bancorporation Plan; and but for such use, U.C.B. would have had to meet such

contributions from its own funds. Such use by U.C.B. has not benefited the members, former members and their beneficiaries of the SFB Plan." The court concluded that the 1962 amendment and the diversions violated section 8 of the plan. The court also concluded that UCB had violated the following statutes: section 2229 of the Civil Code, which provides that "A trustee may not use or deal with the trust property for his own profit, or for any other purpose unconnected with the trust, in any manner"; section 2231 of the Civil Code, which provides that "A trustee may not use the influence which his position gives him to obtain any advantage from his beneficiary"; and section 1591 of the Financial Code, which provides that when a bank is handling trust funds, "such funds shall not be used in the conduct of its business . . . ." We conclude that these findings must be upheld.[2]

However, our conclusion that UCB did violate the provisions of the SFB Plan and the applicable statutes governing UCB's duties as trustee still leaves unresolved a question which lies at the heart of UCB's case: if UCB's wrongful conduct merely gave it access to excess funds, the control of which remained with UCB, and which, under some circumstances, it might in the future acquire, can it then be said that plaintiffs are in a position to complain about UCB's violation of its duties as trustee? It is undisputed that, at any time, UCB could have terminated the SFB Plan, paid plaintiffs their pensions in cash or by means of insurance annuities and retained for itself any surplus remaining in the SFB Plan. It is also undisputed that plaintiffs' participatory right in the SFB Plan was limited to receiving those sums which UCB, as trustee, was required to pay out as a retirement benefit, according to the terms of the plan. Finally, it is undisputed that at all times since the SFB Plan was established, UCB was able to pay such sums out of the fund which had been established for that purpose.

Plaintiffs based their right to recover punitive damages solely upon the allegations in their complaint to the effect that UCB had wrongfully concealed from them the 1962 amendment and the three diversions of funds. The issue of plaintiffs' entitlement to punitive damages was never

---

[2]UCB has attempted to argue that it was improperly held to have violated section 1591 of the Financial Code because, according to UCB, the making of contributions to a pension fund does not constitute a use of such funds "in the conduct of its business." This argument is not persuasive. By maintaining a pension fund for its employees, a bank is directly benefited in the conduct of its business by raising the morale of its employees and insuring that qualified applicants will seek employment with the bank. Moreover, the record reveals that in each of the three instances when UCB diverted funds into the Western Plan trust, it took a "business expense" tax deduction for doing so.

submitted to the trial judge, but was tried before a jury during the second phase of the trial after the trial judge had already held that the 1962 amendment and the diversions were improper. The jurors were instructed that they could award plaintiffs punitive damages only if they found that UCB had fraudulently *concealed* the 1962 amendment and the three fund diversions and that plaintiffs had sustained actual damage as a result of such wrongful conduct. The jury was never asked to determine whether the amendment and the diversions themselves were wrongful or fraudulent, since plaintiffs had not based their right to punitive damages upon such conduct. Also, the jurors were instructed *not* to determine the amount of actual damage caused by the wrongful concealment, since the parties had agreed that the amount of plaintiffs' actual damages would be determined by the trial court during the third and final phase of the trial.

At the final phase of the trial, the court fixed the amount of actual damages at $1. However, the remarks made by the trial judge when he announced this decision make it clear that he did not base such finding on the fraudulent concealment issue, which had previously been decided by the jury, but solely upon the 1962 amendment and the three subsequent diversions of trust funds. In making such award, the court expressed the view that each of the three diversions had resulted in actual damage to plaintiffs because the making of the diversions had prevented UCB from exercising its discretion to increase plaintiffs' benefits under the SFB Plan. Conspicuous by its absence from the record is any reference by the court to the concealment issue. Moreover, the court made several significant remarks in regard to its finding of actual damage as a result of the fund diversion. For example, the court stated that there was no way of knowing whether, in the absence of the diversions, UCB would have increased plaintiffs' benefits in any amount. The court further stated, "It may have not increased pensions at all. It may have granted significant increases. There is no way of knowing what they would have done. . . . It would be sheer speculation for me to put a dollar figure on the amount of actual damages. . . . It could be fifty thousand, it could be a hundred thousand, it could be two hundred thousand, it could be zero . . . ." The trial court did not make any award of punitive damages, since that issue had been previously decided by the jury; instead, the trial court merely incorporated the jury's award of punitive damages into the judgment.

Since plaintiffs chose to submit the punitive damages issue to the jury solely on the basis of UCB's alleged acts of concealment, they may not now seek to find support for such award in the evidence pertaining to the

1962 amendment and to the fund diversions themselves. The instructions given to the jurors foreclosed them from basing their award of punitive damages upon those acts, and the issue of punitive damages was never submitted to the trial court. The court found only that the amendment and diversions had caused plaintiffs actual damage in the amount of $1.

■ The question remaining is whether the jury's award of punitive damages, based upon UCB's acts of concealment, may be upheld. UCB tacitly concedes, as it must, that there was ample evidence that it did conceal the fact of the 1962 amendment and the fund diversions from the beneficiaries of the SFB Plan; thus it becomes unnecessary to summarize such evidence. However, UCB argues that, since it acted on the advice of counsel in failing to disclose the amendment and the fund diversions to plaintiffs, it cannot be deemed to have acted fraudulently or with evil intent. We do not agree.

Section 2233 of the Civil Code provides, in pertinent part, that "If a trustee acquires any interest . . . adverse to the interest of his beneficiary in the subject of the trust, he must immediately inform the latter thereof . . . ."

Section 2234 of the Civil Code provides that "Every violation of the provisions of the preceding sections of this Article is a fraud against the beneficiary of a trust."

It is evident that in adopting the 1962 amendment and making the three fund diversions, UCB acquired an interest adverse to the interests of the beneficiaries of the SFB Plan, since UCB thereby utilized the surplus funds in that plan to its own use and benefit, rather than to the benefit of plaintiffs. As a trustee, UCB had a duty to notify plaintiffs of the amendment and the fund diversions. ■ It is the settled law of this state, and elsewhere, that where there exists a relationship of trust and confidence, it is the duty of one in whom the confidence is reposed to make full disclosure of all material facts within his knowledge relating to the transaction in question, and any concealment of material facts is a fraud. Where there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action. (*Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 32 [136 Cal.Rptr. 378].)

Nor can we accept UCB's argument that because it relied upon advice of counsel, it is exonerated from responsibility for its wrongdoing. The record demonstrates that UCB's entire course of conduct, commencing with the 1962 amendment and culminating with the concealment of that amendment and the fund diversions, was carried out in knowing violation of plaintiffs' rights as beneficiaries of the SFB Plan. The duties and responsibilities of the bank acting in the capacity of a trustee are well described in the case of *Coberly* v. *Superior Court* (1965) 231 Cal.App.2d 685, 689 [42 Cal.Rptr. 64]: "The exercise of judgment by a professional trustee, even if not required to satisfy the standard of a reasonable, prudent man, is the very purpose for which the trustee was employed, and exculpatory powers in the trust instrument are strictly construed. It ill behooves a professional trustee, holding itself out during the solicitation of business as a repository of special competence and expertise, to claim on an accounting it need not answer the charge of neglect of duty. *A banker, a doctor, a lawyer, may not gain business as a specialist and defend mistakes as a layman.*" (Italics added.)

 UCB claims that the award of punitive damages was improper because there was no evidence that plaintiffs suffered actual damage as the result of UCB's concealment of the amendment and the fund diversions.[3] This argument is without merit. It is evident that, had UCB promptly fulfilled its duty by informing plaintiffs of the 1962 amendment, they would then have been in a position to protect their interest in the plan by taking such steps as were required to prevent the fund diversions.

Also, we find no difficulty with the fact that the jury, having been so instructed, did not fix the amount of actual damages caused by the wrongful concealment, but merely found that such damages had been sustained by plaintiffs.

 It is settled law in California that punitive damages cannot be awarded unless actual damages are suffered. (*O'Neil* v. *Spillane* (1975) 45 Cal.App.3d 147, 161 [119 Cal.Rptr. 245], and cases cited therein.) "Evil thoughts or acts, barren of result, are not the subject of exemplary damages." (*Mother Cobb's Chicken T., Inc.* v. *Fox* (1937) 10 Cal.2d 203, 206 [73 P.2d 1185].) However, the more usual application of punitive damages is somewhat didactic in nature. For example, in *Ward* v. *Taggart* (1959) 51 Cal.2d 736 [336 P.2d 534], the California Supreme Court upheld

---

[3] "While plaintiffs arguably showed damage from the amendment and the three instances of crediting, they demonstrated no injury from the separate, alleged tortious act—the fraudulent concealment—upon which the award of punitive damages was based." (UCB's opening brief, pp. 58-59.)

an award of punitive damages even though the .evidence established that the plaintiff, who had been defrauded by a real estate broker, had received real property worth at least what he had paid for it. The court reasoned that the purpose of exemplary damages was to discourage oppression, fraud or malice by punishing the wrongdoer, and that the mere granting of restitution would not have accomplished this objective. (P. 743.)

In *Sterling Drug, Inc.* v. *Benatar* (1950) 99 Cal.App.2d 393, 400 [221 P.2d 965], the court upheld an award of nominal damages in the amount of $1 and punitive damages in the amount of $200, stating, "Nominal damages are not only recovered where no actual damage resulted from an ascertained violation of right but also where actual damages have been sustained, the extent of which cannot be determined. [Citation.] The granting of exemplary damages in cases of the latter kind is not inconsistent with the rule that actual damage is a necessary predicate of punitive damages [citation]."

In *James* v. *Public Finance Corp.* (1975) 47 Cal.App.3d 995 [121 Cal.Rptr. 670], the court held that the rule that a verdict for zero compensating damages will nullify an award of punitive damages does not apply in a case where an admitted tortious act resulted in some actual damage which manifestly appears from the evidence.

In *Esparza* v. *Specht* (1976) 55 Cal.App.3d 1 [127 Cal.Rptr. 493], the appellate court held that, for purposes of finding actual damages to justify recovery of punitive damages, as allowed by section 3294 of the Civil Code, it is sufficient that the defrauded party show a damage, and not that he must show bottomline damages (p. 9).

Finally, in Topanga Corp. v. *Gentile* (1967) 249 Cal.App.2d 681, 691 [58 Cal.Rptr. 713], the court rejected the defendants' contention that exemplary damages could not be recovered where the plaintiff was not granted compensatory damages. The court stated, "the fact that plaintiffs were not given a grant of monetary damages of a certain amount is not determinative. . . . [¶] The requirement of 'actual damages' imposed by section 3294 is simply the requirement that a tortious act be proven if punitive damages are to be assessed. 'The rule that exemplary damages cannot be imposed unless the plaintiff has suffered actual damages [citations] is based on the principle that the defendant must have committed a tortious act before exemplary damages can be assessed.' (*Brewer* v. Second Baptist Church, 32 Cal.2d 791, 801-802 [197 P.2d 713].) The requirement was met here."

█ In those cases which involve a breach of fiduciary relationship, the requirement that there be proof of actual damage in order to support an award of exemplary damages is greatly deemphasized. This concept of punishing the wrongdoer for violating his trust, notwithstanding a lack of apparent injury to his beneficiary, is not new. In the 1919 case of *Menefee v. Oxnam*, 42 Cal.App. 81 [183 P. 379], the problem on appeal concerned the misdeeds of one of several joint venturers. The court pointed out that, although it is the general rule that fraud without at least some slight injury is not ground for relief, "this general rule is not an obstacle to recovery in cases of the kind here under consideration, even though there be a total absence of injury to the complaining party. That is, where one occupies a fiduciary relation to the plaintiff, and, acting in co-operation with the defendant, he abuses the confidence of the plaintiff, his associate in a common enterprise, by entering into a secret agreement with the defendant, the general rule that fraud without injury is not ground for relief is not applicable, and the plaintiff will be entitled to relief whether he has been injured or not. Both law and equity have a most tender regard for the rights of a complaining party growing out of a fiduciary relationship. So that where any abuse of that relation is discovered, the complaining party is entitled to relief, whether any actual damage be established or not. In this class of cases, the question is not whether the breach of confidence has resulted in profit to the unfaithful coadventurer, or whether it has resulted in injury to his joint adventurers, but whether there has been a breach of confidence on the part of the fiduciary. The great solicitude of the courts has been rather wholly to avoid any recognition of a principle that, in the hands of avaricious and cunning men, might be turned to their own account, than to inquire whether the complaining party has suffered any actual disadvantage. The rule that a coadventurer must act with utmost good faith, and in all things be faithful and loyal to his associates and to the purpose of the enterprise, is not intended to be remedial of actual wrong, but preventive of the possibility of it; and it matters not that there is no fraud meditated and no injury done." (Pp. 87-88.)

█ We conclude that, under the reasoning of such decisions, the jurors' finding in this case that plaintiffs suffered actual damages in some unspecified amount as a result of UCB's fraudulent acts of concealment, furnishes ample support for their award of punitive damages.

█ Further, we find no merit in UCB's claim that the award of punitive damages was excessive. When UCB agreed that the jury would be allowed to award punitive damages without fixing the dollar amount of compensatory damages, UCB waived the right to complain that the

punitive damages did not bear a reasonable relationship to the actual damages. In any event, we find nothing unreasonable in the assessment of $550,000 in punitive damages against a corporate defendant which possessed $8.97 billion in assets and had wrongfully diverted $762,000 in trust funds.

■ Finally, UCB contends that the trial court's award of $400,000 in attorney's fees cannot be upheld. UCB correctly points out that the trial court found that plaintiffs' attorneys had devoted a total of 1,398 hours to the case and that the award of $400,000 thus compensates plaintiffs' attorneys at the rate of $286 per hour. UCB asserts that such an award is excessive as a matter of law.

Two recent federal decisions set forth helpful guidelines to be followed in making an award of attorney's fees in a case such as this one. In *National Ass'n. of Reg. Med. Prog., Inc.* v. *Weinberger* (D.D.C. 1975) 396 F.Supp. 842, 848, the court reasoned that while an attorney who successfully prosecutes a complex class action must receive reasonable compensation for his efforts, the courts must remain "mindful that there has been great criticism of attorneys for excessive fees in contingent fee situations." The *Weinberger* court determined that a reasonable hourly rate for the plaintiffs' attorney was $70 and that he was also entitled to a 100 percent incentive bonus due to the fact that he had prevented the diversion of $30 million from plaintiff class, had skillfully handled novel and complex issues, and had doggedly pursued a case with a highly contingent outcome which no other attorney had been willing to accept due to the plaintiffs' inability to pay legal fees and the very real likelihood that the plaintiffs might not prevail on the merits.

In a later case, *Parker* v. *Matthews* (D.D.C. 1976) 411 F.Supp. 1059, 1067-1068, the court held that the factors to be considered in fixing an award of attorney's fees included "(1) the novelty and complexity of the issues, (2) the amount of risk involved in taking the case, (3) the nature and amount of the results obtained, and (4) the skill required to perform the legal services properly." In *Parker,* the plaintiff's attorneys had successfully obtained redress for employment discrimination based upon race and sex. The court noted that the case was a factually difficult one, that the risk involved was substantial, that plaintiff's attorneys had given the case continued attention over a three-year period, and that they had faithfully and zealously represented the plaintiff with a high degree of skill and in accordance with the highest traditions of the bar. The plaintiff's three attorneys were compensated by the court at the hourly rate of $60, $35 and $30, respectively, and were given an incentive fee of 25 percent.

The California courts have followed a similar approach. In *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 31-32, 34-48 [141 Cal.Rptr. 315, 569 P.2d 1303], the California Supreme Court held that the three equitable theories upon which a successful litigant's attorney may be compensated from the fruits of the litigation, or by the other side, are the "common fund" doctrine, the "substantial benefit" rule, and the "private attorney general" concept (p. 46). The court observed that the "touchstone" components were the same in an award made under any of these three theories and that those components consisted of the time spent by the attorneys and the value per unit of such time (pp. 48-49). The court concluded that it was only after a trial court had made a careful compilation of the time spent and the reasonable hourly compensation of each attorney that the court could then determine whether the award of attorney's fees should be augmented or diminished on the basis of such factors as the novelty and difficulty of the questions presented, the skill displayed by the attorneys and the contingent nature of the fee award (pp. 48-49).

Here, the trial court found that the services rendered by plaintiffs' attorneys "were undertaken at substantial financial risk involving complex and difficult legal and factual issues which are deserving of special recognition and reward; that said services were performed ably and skillfully and resulted in substantial benefits to plaintiffs . . . ." Although these findings are amply supported by the record before us, it nevertheless appears that this matter must be reexamined by the trial court.

The record in this case reveals that, prior to a hearing on attorney's fees which took place on January 17, 1976, plaintiffs' attorneys had filed declarations averring that Charles Scully, who was a specialist in pension fund matters, had spent 80 hours on the case. His two associates, Stephen Schrey and Donald Carroll, had devoted 255 hours and 927 hours, respectively, to the case. Thus, a total of 1,262 hours had been logged by plaintiffs' attorneys prior to the January 17 hearing. The trial court orally announced at the hearing that plaintiffs' attorneys had thus far devoted approximately 1,300 hours to the case and that their efforts had resulted in very substantial benefits to plaintiffs, consisting of $762,000 in funds restored to the SFB Plan and $550,000 in punitive damages. The court stated that it was fixing attorney's fees to date at $400,000 and that for future legal services rendered in the case, plaintiffs' attorneys would be compensated at the rate of $100 per hour for a partner in the law firm and $60 per hour for nonpartners. Mr. Carroll filed a supplemental declaration in which he acquiesced in the court's statement that Mr. Scully should be compensated for further services at the rate of $100 per hour

and his associates, Schrey and Carroll, at the rate of $60 per hour. In this declaration, Carroll averred that subsequent to the January 17 hearing, Mr. Scully had devoted 2 hours to the case and Schrey and Carroll a total of 108 hours.

As it now stands, the award of $400,000 in attorney's fees appears to bear no relationship to the rate of compensation and number of hours spent by the attorneys. While the court did determine the hourly rate of compensation to be paid for *future* legal services, it doesn't necessarily follow that such rates should be applied to services rendered during pretrial and trial. In view of his findings regarding the difficult and complex nature of the issues involved, the trial judge may well determine that the compensation for services rendered in preparation for, and at, trial should be fixed at a higher rate than that which he has set for future legal services. After an appropriate rate is applied to the total number of hours involved, the court is then at liberty to make further calculation by way of augmentation or diminution of the base figure, if it wishes to do so.

In their appeal from the judgment, plaintiffs contend that: (1) the trial court ought to have fixed plaintiffs' actual damages at a sum substantially in excess of $1, and (2) the trial court erred in determining that it could not compel UCB to increase plaintiffs' pensions.

■ Plaintiffs argue that they should not be made to suffer because UCB's wrongful conduct in making the fund diversions has made it difficult to measure plaintiffs' damages. They claim that a proper measure of such damages was readily available, since the trial court could simply have determined that plaintiffs were injured in the total amount of the three fund diversions made by UCB. Plaintiffs rely upon *Pacific etc. Co.* v. *Packers' Assn.* (1903) 138 Cal. 632, 638 [72 P. 161], as authority for the proposition that it is sufficient if the measure of damages not be "merely fanciful." They note that in *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 639 [111 Cal.Rptr. 704, 517 P.2d 1168], it was held that trial courts must do the best they can and use all available facts to approximate the fair and reasonable damages under all the circumstances. Plaintiffs contend that they produced evidence which would have supported a finding that an honest trustee, exercising an honest discretion, would have increased plaintiffs' pensions in the amount of the three diversions.

Plaintiffs' position is not supported by the record. Their actuarial expert, Mr. Prien, did not testify as to what an honest trustee *would* have

done in the absence of the three diversions. He testified only that it would have been *possible* or *feasible* to increase plaintiffs' pensions in the absence of the diversions and that there was nothing to prevent UCB from doing so. This testimony was clearly insufficient to support anything beyond a "merely fanciful" finding that UCB would have increased plaintiffs' pensions in any amount.

■ Plaintiffs' contention that the trial court ought to have ordered UCB to increase their pensions suffers from a similar defect. They concede that there was no provision in the SFB Plan which expressly required any increase in pensions, yet they argue that it must have been the intent of the original settlor of the SFB Plan fund, the San Francisco Bank, that their pensions would be increased periodically, as the assets in the fund grew. Plaintiffs find evidence of such intent in section 7 of the SFB Plan, which authorizes the pension committee to determine the rate of interest income "for use in determining the amount of contributions and pensions under the Plan." Plaintiffs also find a further manifestation of the settlor's intent to increase their pensions in the fact that in 1954, the San Francisco Bank did amend the plan so as to increase pensions.

Such arguments are not persuasive. At best, they establish that UCB had discretion under the SFB Plan to increase plaintiffs' pensions if it chose to do so. Plaintiffs point to no provision in the plan which requires UCB to increase benefits. The evidence indicates that the SFB Plan was overfunded from the very beginning, presumably due to actuarial miscalculations. The plan provides that, upon termination, any excess funds remaining due to actuarial error shall be retained by UCB. Accordingly, we conclude that the trial court was correct in determining that, once UCB had advised the court that it would not exercise its discretion to increase plaintiffs' pensions, the court was without the authority to compel it to do so.

In summary:

We agree with the trial court's determination that by diverting surplus funds in the manner described, UCB acted wrongfully and in clear and knowing violation of the terms of the SFB Plan. Further, we hold that it was appropriate for the trial court to direct UCB to restore the diverted funds to the SFB Plan, this in accordance with the provisions of section 2237 of the Civil Code. Also, we concur with the trial court's determination that it was without authority to direct UCB to increase plaintiffs' pension benefits.

Further, we agree with the trial court's determination that defendant acted in a clear and knowing violation of its duties and obligations as a trustee of the SFB Plan. While plaintiffs chose to regard the acts of concealment and diversion of funds as separate issues, we perceive the entire course of conduct as a fraud against the beneficiaries of a trust, in clear violation of the provisions of section 2234 of the Civil Code. Undoubtedly, such conduct was detrimental to the interests of the beneficiaries and members of the SFB Plan, so as to warrant an award of punitive damages to plaintiffs. Such award, under the circumstances of this case, was not excessive.

We agree with the trial court's award of a nominal sum as actual damages suffered by plaintiffs on account of the wrongful diversion of trust funds, since any amount in excess of $1 necessarily would be based upon speculation and conjecture.

Finally, we conclude that the award of attorney's fees in the amount of $400,000 cannot be upheld since the trial court failed to establish a proper basis therefor; accordingly, we remand the matter to the trial court for a redetermination thereof.

UCB's purported appeal from any and all interlocutory orders and rulings which are a part of the judgment appealed from is dismissed.

Insofar as it awards attorney's fees to plaintiffs in the amount of $400,000, the judgment is reversed and the matter remanded to the trial court for redetermination of such fees in light of the views expressed herein. Further, the trial court is directed to determine and award a reasonable attorney's fee for services rendered on appeal in obtaining an affirmance of the judgment in plaintiffs' favor, and to add such fee to the judgment in favor of plaintiffs.

In all other respects, the judgment is affirmed. The order denying the motion for judgment notwithstanding the verdict is affirmed.

Costs on appeal are awarded to plaintiffs.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied November 29, 1978, and the opinion was modified to read as printed above. The petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied January 3, 1979.